1  MICHAEL PIETRYKOWSKI  (SBN 118677)
   MPIETRYKOWSKI@GORDONREES.COM
2  JAMES SCADDEN (SBN 90127)
   JSCADDEN@GORDONRESS.COM
3  GLEN R. POWELL (SBN 219453)
   GPOWELL@GORDONREES.COM
4  GORDON & REES LLP
   Embarcadero Center West
5  275 Battery Street, Suite 2000
   San Francisco, CA 94111
6  (415) 986-5900
   (415) 986-8054
7
8  Attorneys For Defendant
   LESLIE CONTROLS, INC.
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12  HARRY LEMASTER and CAROLYN        )  CASE NO. 08-cv-03316-JCS
    LEMASTER,                         )
13                                    )  **LESLIE CONTROLS, INC.S
              Plaintiff,              )  JOINDER IN RELIANCE
14                                    )  ELECTRIC COMPANY'S
         vs.                          )  NOTICE OF REMOVAL**
15                                    )
    ALLIS CHALMBERS CORPORATION       )
16  PRODUCT LIABILITY TRUST, et al.,  )
                                      )
17            Defendants.             )
18  ─────────────────────────────────

19

20                    **I.    INTRODUCTION**

        The Notice of Removal was appropriate in regards to Reliance Electric
21
    Company, with the same authorities and logic applying equally to LESLIE
22
    CONTROLS, INC. ("LESLIE").  Defendant LESLIE, hereby joins in and
23
    incorporates by reference as though fully set forth herein the points and authorities
24
    relied upon in the Notice of Removal of Reliance Electric Company.  LESLIE,  as
25
    demonstrated by the attached declarations of Matthew Wrobel and Ret. Admiral
26
    Roger Horne, acted under the direction and control of federal officers.  **(Exhibit 1**
27

28

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    **and Exhibit 2.)**  In addition, Leslie refers this court to the following recent

2    authorities which advise that the federal officer removal statute is to be interpreted

3    broadly in favor of removal.

## II.    ARGUMENT

5    In 2006, the Ninth Circuit unequivocally stated in *Durham v. Lockheed*

6    *Martin Corporation,* 445 F. 3d 1247, 1252 (9th Cir. 2006) (citations omitted) that

7    "the Supreme Court has mandated a generous interpretation of the federal officer

8    removal statute . . . [and] has held that the right of removal is absolute for conduct

9    performed under color of federal office, and has insisted that the policy favoring

10   removal should not be frustrated by a narrow, grudging interpretation of

11   *§ 1442(a)(1).*"  In light of the *Durham* court's ruling, several California federal

12   district courts have recently held that they are required to interpret § 1442 broadly

13   in favor of removal where a manufacturer of equipment demonstrates that it acted

14   under the direction of a federal officer, raises a colorable federal defense to

15   Plaintiffs' claims and establishes a causal connection between its alleged action

16   under the control of a federal officer and Plaintiffs' claims.  *See Ballenger v. Agco*

17   *Corporation,* 2007 WL 1813821 (N.D. Cal. June 22, 2007) (a copy of Judge

18   Wilken's Order is attached as **Exhibit 3**); *Nelson v. Alfa Laval, Inc.* et al, CV 07-

19   8338VBF(RCx) (a copy of Judge Fairbank's Order is attached as **Exhibit 4**);

20   *Wright v. A.W Chesterton, Inc.,* CV 07-05403MJJ (a copy of Judge Jenkin's Order

21   is attached as **Exhibit 5**).

22   Like defendant Reliance Electric Company, Leslie may also assert a federal

23   officer defense pursuant to the declaration of Matt Wrobel filed and served

24   concurrently herewith.  Matthew Wrobel as a corporate representative of LESLIE

25   attests to his own personal experience of the extensive direction and control

26   exercised by the US Navy in regards to equipment suppliers such as LESLIE.  This

27

28

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

LESLIE CONTROLS JOINDER IN NOTICE OF REMOVAL – CASE NO. :08-cv-03316-JCS

declaration, the declaration of Ret. Admiral Roger Horne and the declarations submitted by Reliance Electric Company leave no question that the US Navy directed and controlled ALL of the activities of LESLIE vis-a – vis its contracts to provide equipment for use on US Navy warships.

## II.     <u>CONCLUSION</u>

Accordingly, for the reasons set forth above and in the Notice of Removal of Reliance Electric Company, the removal of this case to federal court was appropriate.

Dated:  July 17, 2008

GORDON & REES, LLP

By: _____
GLEN R. POWELL
Attorneys for Defendants
LESLIE CONTROLS, INC.

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

LECO/1047746/5262350v.1

LESLIE CONTROLS JOINDER IN NOTICE OF REMOVAL – CASE NO. :08-cv-03316-JCS

# EXHIBIT 1

1    MICHAEL PIETRYKOWSKI  (SBN 118677)
     MPIETRYKOWSKI@GORDONREES.COM
2    JAMES SCADDEN (SBN 90127)
     JSCADDEN@GORDONRESS.COM
3    GLEN R. POWELL (SBN 219453)
     GPOWELL@GORDONREES.COM
4    GORDON & REES LLP
     Embarcadero Center West
5    275 Battery Street, Suite 2000
     San Francisco, CA 94111
6    (415) 986-5900
     (415) 986-8054
7
     Attorneys For Defendant
8    LESLIE CONTROLS, INC.

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13   HARRY LEMASTER and CAROLYN  )   CASE NO. 3:08-cv-03316-JCS
     LEMASTER,                    )
14                                )
                  Plaintiff,      )   **DECLARATION OF MATTHEW
15                                )   WROBEL IN SUPPORT OF
           vs.                    )   DEFENDANT LESLIE
16                                )   CONTROLS, INC.'S NOTICE OF
     ALLIS CHALMBERS CORPORATION )    REMOVAL**
17   PRODUCT LIABILITY TRUST, *et al.*, )
                                  )
18                Defendants.     )
19   ─────────────────────────────)

20

21

22

23

24

25

26

27

28

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

LECO/1052065/5817590v.1

I, Matt Wrobel, declare:

1.      I am employed by Leslie Controls, Inc. ("Leslie") as the Group Director of Quality Assurance, and have been employed by Leslie in various capacities for forty-one years.

2.      Leslie has been in business since around 1905 and I am personally familiar with the products that Leslie has manufactured throughout its corporate history.

3.      I am also personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Leslie for valves and related equipment because I was personally involved in such contracts at the various stages of development, including production, testing, and acceptance.

4.      I submit this affidavit to attest to the degree of involvement, supervision, direction and control exercised by the U.S. Navy and/or its authorized agents and officers in connection with procurement contracts with Leslie for equipment to be installed aboard U.S. Naval vessels. The following paragraphs describe the contract process from the perspective of Leslie as the vendor, as well as the levels of interaction between Leslie and the Navy agents and personnel through the various stages of a given contract.

5.      Leslie furnished and fabricated valves and related equipment for U.S. Navy vessels under contract between Leslie and the United States Navy Department and/or its authorized government agencies, officers and personnel.

6.      Leslie was obligated to comply with Military Specifications ("Mil Specs") which cover all specific components of the valves and any related equipment, including accessories, subcomponents, and other materials required to fabricate the Leslie equipment.

7.      Equipment sold by Leslie to the U.S. Navy for use on Navy ships always had to be provided pursuant to detailed specifications issued by the government. For example, attached hereto as Exhibit A is a copy of Valves, Pressure Reducing, Steam Service, MIL -V- 17848B, 1968) . This specification in turns incorporates by reference numerous additional specifications such as "Gaskets, Metallic- Asbestos, Spiral Wound", MIL -G- 21032). These specifications

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

DECLARATION OF MATTHEW WROBEL

1   dictated the materials that Leslie was to use in component parts in the equipment.  These

2   specifications were made part of the contract, and strict compliance therewith was mandatory.

3          8.  The U.S. Navy and/or its authorized government agencies had a consistent and

4   thorough program of inspecting equipment sold by Leslie to ensure that such equipment

5   complied with all U.S. Navy/ government contract requirements.  This program of inspection

6   included ongoing site inspections during the manufacturing process at the Leslie plants.  I have,

7   for the past forty years interfaced with many if not all of the Government / Navy Quality

8   Assurance Inspectors assigned to LESLIE from the 1960's to present.  The names of some of

9   these inspectors were Mr. Frank Mishnekoff (1960's), Mr. Jules Raymond (1970's), Mr. Charles

10  Crossan (1980's), Mr. Allen Eubanks (1980's), Mr. Daniel Nusekabel (1990's) and Mr. Bruce

11  Smith (1990's).  I personally interacted with these individuals in different capacities on a regular

12  basis. They all had the authority, and exercised the authority, to closely inspect our work, accept

13  or reject product and to halt production on any occasion that they felt Leslie was not in

14  compliance with U.S. Navy / government contract specifications. Government, Navy and

15  shipyard quality personnel would also inspect Leslie supplied equipment at the receipt activities.

16  Government, Navy and shipyard quality personnel would perform inspections of welds and

17  materials which sometimes included x-ray film to ensure compliance with specifications.

18         9.       Attached hereto and made a part hereof and marked as Exhibit B is a true and

19  correct copy of a document that has been obtained at my direction from records kept in the

20  ordinary course of business by Leslie.  This document is an example of an "Inspection and Test

21  Report – Certificate of Compliance" issued by Leslie and accepted and signed by government

22  inspectors upon completion of thorough testing of Leslie equipment.  This particular Certificate

23  describes the numerous tests and inspections that were accomplished upon Leslie equipment

24  destined to the Newport News Shipbuilding and Drydock Co. for installation upon U.S. Navy

25  ships in the 1971 time frame.  The government had detailed specifications describing the

26  inspections and testing to be accomplished, for example attached hereto and marked as Exhibit C

27  is a true and correct copy of MIL – I – 45208A that has been obtained at my direction from the

28  records kept in the ordinary course of business by Leslie.  This is an example of one of the many

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

DECLARATION OF MATTHEW WROBEL

1    specifications that would be made part of the contract between Leslie and the U.S. Navy.

2        10.    U.S. Navy inspection and testing continued at the shipyards where Leslie

3    equipment was installed on board U.S. Navy ships. Inspectors at the shipyard had the authority,

4    and exercised the authority, to inspect and accept equipment based upon its compliance with

5    Navy specifications. Over the past forty yeas I personally interfaced with many Government and

6    shipyard quality personnel concerning equipment supplied and it's compliance to required

7    specifications. It was understood that should these personnel deem the equipment to not be in

8    compliance with requirements, the equipment in question would be rejected and returned for

9    modification or replacement.

10        11.    U.S. Navy inspection and testing continued in "Sea Trials" wherein the Navy

11    rigorously tested all equipment at sea under diverse conditions. Only if the equipment performed

12    to the satisfaction of the Navy would that equipment be accepted. It was understood that the U.S.

13    Navy directed and controlled these testing procedures, and that U.S. Navy directed and

14    controlled whether any equipment would be found unsatisfactory so as to require modification or

15    replacement.

16        12.    The U.S Navy also conducted further testing of exemplar equipment. For

17    example, periodically Leslie was obliged to send exemplars to facilities such as the Naval

18    Engineering Station, or the Naval Boiler and Turbine Laboratory where the exemplars were

19    subjected to extensive inspection and testing under diverse conditions. Should the Navy find any

20    deficiencies in the manufacture or function of the equipment, the Navy directed and controlled

21    Leslie in formulating a response to correct any such deficiencies. Attached hereto and made a

22    part hereof and marked as Exhibit D is a true and correct copy of a document that has been

23    obtained at my direction from records kept in the ordinary course of business by Leslie. This

24    document describes a Leslie Governor that was sent at the direction of Frank Mishnekoff from

25    Leslie to the United States Navy Marine Engineering Laboratory in Annapolis, MD for

26    "performance tests." Results of such testing were to be directed to Mr. Mishnekoff at his address

27    at the Leslie production facility.

28        13.    In addition to the above design, manufacture and testing there remained an

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

-4-

DECLARATION OF MATTHEW WROBEL

1  obligation by Leslie to provide technical manuals for the valves and related equipment furnished

2  pursuant to a U.S. Navy / government contract. The U.S. Navy exercised direction and control

3  over all written documentation to be delivered with its naval valves such as engineering

4  drawings, test reports, technical manuals and other technical data that could be used as needed by

5  the shipboard engineering officer during the life of the equipment. Leslie created the technical

6  manuals in accordance with the Mil Specs and then submitted them for revisions, modifications

7  and the ultimate approval of the U.S Navy and/or its authorized government agencies. Navy

8  personnel participated in the preparation of this kind of information and exercised specific

9  direction and control over its contents. These manuals included safety information related to the

10  operation of naval valves and related equipment only to the extent directed by the Navy.

11       14.    Furthermore, the U.S. Navy had precise specifications, practices and procedures

12  that governed the content of any communication affixed to machinery supplied by Leslie to the

13  Navy as shown on approved Navy drawings. At no time did the U.S. Navy instruct Leslie

14  Controls to affix warnings or caution statements regarding asbestos hazards to a piece of

15  equipment intended for installation onto a U.S. Navy vessel.

16       15.    In conclusion, in each and all instances wherein Leslie contracted with the U.S.

17  Navy for the provision of equipment, the U.S. Navy exercised direction and control over the

18  design, manufacture, inspection and testing of all such equipment. Pursuant to the terms of all

19  contracts which Leslie entered with the U.S, Navy, the U.S. Navy retained such authority to

20  direct and control the performance under the terms of the contract.

22  Executed under penalty of perjury this 26 of March 2008 at TAMPA, Florida.

24                                            Matthew Wrobel

Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

LECO/1049920/5527000v.1

-5-

# EXHIBIT A

MIL-V-17848B(SHIPS)
12 November 1968
SUPERSEDING
MIL-V-17848A(SHIPS)
19 November 1958
(See 6.5)

MILITARY SPECIFICATION

VALVES, PRESSURE REDUCING, STEAM SERVICE

1. SCOPE

1.1 Scope. This specification covers self-contained pressure reducing valves for steam service.

1.2 Classification. Pressure reducing valves shall be of the following classes, and compositions as specified (see 6.2): (See Amendment 4)

Class A – Internal pilot operated
Class B – Inverted, gas loaded, liquid sealed
Class C – Spring loaded
Composition A – 2-1/4 percent chromium 1 percent molybdenum
Composition B – 1-1/4 percent chromium 1/2 percent molybdenum
Composition D – Carbon steel
Composition E – Bronze

2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitation for bids or request for proposal, form a part of the specification to the extent specified herein.

SPECIFICATIONS

MILITARY

MIL-S-901 – Shock Tests, H.I. (High-Impact); Shipboard Machinery, Equipment and Systems, Requirements for.
MIL-D-1000 – Drawings, Engineering and Associated Lists.
MIL-R-2765 – Rubber Sheet, Strip, Extruded, and Molded Shapes, Synthetic, Oil Resistant.
MIL-Q-9858 – Quality Program Requirements.
MIL-R-17131 – Rods, Welding, Surfacing.
MIL-F-20042 – Flanges, Pipe, Bronze (Silver Brazing).
MIL-G-21032 – Gaskets, Metallic-Asbestos, Spiral Wound (For ASA Commercial Flanged Joints in Piping Systems).

STANDARDS

MILITARY

MIL-STD-167 – Mechanical Vibrations of Shipboard Equipment.
MIL-STD-798 – Nondestructive Testing, Welding, Quality Control, Material Control and Identification and NI-Shock Test Requirements for Piping System Components for Naval Shipboard Use.
MS16142 – Boss, Gasket Seal Straight Thread Tube Fitting, Standard Dimensions for.
MIL-STD-278

PUBLICATIONS

NAVSHIPS

NAVSHIPS 0948-045-7010 – Material Identification and Control (MIC for Piping Systems).

(Copies of specifications, standards, drawings and publications required by suppliers in connection with specific procurement functions should be obtained from the procuring activity or as directed by the contracting officer.)

2.2 Other publications. The following documents form a part of this specification to the extent specified herein. Unless otherwise indicated, the issue in effect on date of invitation for bids or request for proposal shall apply.

FSC 4820

EXHIBIT
70.500

0650

28124

MIL-V-17848D(SHIPS)

AMERICAN SOCIETY FOR TESTING AND MATERIALS (ASTM)
A105 – Forged or Rolled Steel Pipe Flanges, Forged Fittings, and Valves
and Parts for High-Temperature Service.
A182 – Forged or Rolled Steel Pipe Flanges, Forged Fittings, and Valves
and Parts for High-Temperature Service.
A193 – Alloy Steel Bolting Materials for High Temperature Service.
A194 – Carbon and Alloy Steel Nuts for Bolts for High-Pressure and High-
Temperature Service.
A216 – Carbon Steel Castings Suitable for Fusion Welding for High-
Temperature Service.
A217 – Alloy Steel Castings for Pressure-Containing Parts Suitable for
High-Temperature Service.
A306 – Carbon Steel Bars Subject to Mechanical Property Requirements.
B61 – Steam or Valve Bronze Castings.

(Application for copies should be addressed to the American Society for Testing and
Materials, 1916 Race Street, Philadelphia, Pa. 19103.)

UNITED STATES OF AMERICA STANDARDS INSTITUTE (USAS)
B1.12 – Class 5 Interference-Fit Thread.
B16.5 – Steel Pipe Flanges and Flanged Fittings.

(Application for copies should be addressed to the United States of America Standards
Institute, 10 East 40th Street, New York, N. Y. 10016.)

NATIONAL BUREAU OF STANDARDS
Handbook H28 – Screw Thread Standards for Federal Services.

(Application for copies should be addressed to the Superintendent of Documents, Government
Printing Office, Washington, D. C. 20402.)

UNIFORM CLASSIFICATION COMMITTEE
Uniform Freight Classification Rules.

(Application for copies should be addressed to the Uniform Classification Committee,
20   Union Station, 516 West Jackson Boulevard, Chicago, Illinois 60606.)

(Technical society and technical association specifications and standards are generally
available for reference from libraries. They are also distributed among technical groups
and using Federal agencies.)

3. REQUIREMENTS

3.1 Qualification. The valves furnished under this specification shall be products
which are qualified for listing on the applicable qualified products list at time set for
opening of bids (see 4.2 and 6.3).

3.2 Definitions. The definitions specified in 3.2.1 through 3.2.7 are applicable
to this specification.

3.2.1 Set pressure. The downstream pressure which the valve is set to maintain under
a given set of operating conditions (i.e. inlet pressure and flow). Normally the valve
is set with a flow of approximately 30 percent of rated capacity.

3.2.2 Accuracy of regulation. The maximum permissible band over which the downstream
pressure may vary when the valve is set at any pressure within the required range of adjust-
ment and is subjected to any combination of inlet pressure, flow demand, and ambient
temperature variations, within the specified limits.

3.2.3 Set pressure limits. The range of set pressures over which the valve can be
adjusted while meeting the performance requirements specified.

3.2.4 Lock-up pressure. The outlet pressure delivered by a reducing valve under
shut off conditions (i.e. when the flow is reduced to a point where it is equal to or less
than the allowable leakage).

3.2.5 Nominal pressure. The approximate maximum pressure which the valve will be
subjected to in service under normal conditions.

3.2.6 Design pressure and temperature. The maximum pressure and temperature the
valve should be subjected to under any condition. The pressure and temperature upon which
the strength of the pressure containing envelope is based.

2

3.2.1 Proof pressure. The maximum test pressure that the valve is required to with-stand without permanent damage. Valve operation is not required during application of the proof pressure, but after the pressure has been removed, the valve shall be capable of meeting all performance requirements.

3.3 Materials. Materials shall be as specified in table I. Materials for parts other than those listed in table I shall be suitable for the intended pressures and tem-peratures and shall be selected to prevent galling, seizing, or excessive wear on operating parts. Clearances shall be such as to prevent interferences due to thermal expansion.

Table I - List of materials

| Name of parts | Composition A | Composition B | Composition D | Composition E |
|---|---|---|---|---|
| Body, bonnet, and bottom cover | ASTM A182 grade F22 ASTM A217 grade WC9 | ASTM A182 grade F11 ASTM A217 grade WC6 | ASTM A105 grade 11 ASTM A216 grade WCB ASTM A306 grade 60 | ASTM D61 |
| Internal trim | See 3.3.1 | | | |
| Cylinder liner and piston (class A) | 400 series corrosion-resistant steel - Parts shall have surface hardness of 500 Brinell minimum. | | | 400 series cor-rosion-resistant steel ASTM D61 Nickel-copper alloy |
| Gaskets | Spiral wound. Material and construction in accordance with MIL-G-21032. Load character-istics as required by valve design and ap-plication. | | | Not approved In Accordance with MFRs STD. Practice (amend. 4) |
| Diaphragm (metallic) | Nickel-copper alloy 300 series corrosion-resistant steel Nickel-chrome alloy | | | |
| Diaphragm (nonmetallic) | MIL-R-2765 ~~corrosion-resistant~~ (amend. 4) | | | |
| Springs | See 3.3.2 | | | |
| Bolting[1] | ASTM A193 grade B16 ASTM A194 grade 4 | ASTM A193 grade B16 ASTM A194 grade 2H | ASTM A193 grade B7 ASTM A194 grade 2H | ASTM A193 grade B7 ASTM A194 grade 2H Nickel-copper alloy corrosion-resistant steel |

[1]/If desired by the manufacturer, the higher grade bolting materials may be used in lower temperature categories (i.e. ASTM A194, grade 4 may be used for composition D, etc.)

3.3.1 Trim materials. Unless otherwise specified (see 6.2) the valve manufacturer shall select, from the categories listed in 3.3.1.1 and 3.3.1.2 (where applicable), the trim materials best suited to meet the requirements of the application.

3.3.1.1 Main valve trim materials. Main valve trim (defined as consisting of the seat or seat ring, and plug and the guide posts and bushings) materials shall be selected from the following:

Stellite - All trim to be stellite (see noteE *metallic in 3.3.2*, ...)
Hardened corrosion-resistant steel - Hardened corrosion resistant steel plus
    400 series or 17-4 PH) and stellite (see note) seat or seat ring. Guiding surfaces to be hardened corrosion-resistant steel or stellite (see note). For composition E valves, bronze guide bushings may be used.

MIL-V-17840D(SHIPS)

Non-galling grades of materials shall be chosen to prevent galling between rubbing surfaces. A difference in hardness of at least 100 points Brinell shall be maintained between the rubbing surfaces of the guide bushings and posts. This requirement does not apply if both the guide bushings and posts are stellited or if the hardness of either exceeds 450 Brinell.

3.3.1.2  Pilot valve trim materials (class A). Pilot valve trim (defined as consisting of the seat, valve, and guiding surfaces) shall be made from one or a combination of the following materials:

400 series or 17-4 PH corrosion resistant steel - hardened
Stellite (see note)

NOTE: Where stellite is specified, it may consist of either wrought stellite 6B, cast stellite 6, or an inlay of stellite (not less than 3/32 inch thickness for main seat and disc surfaces). Where inlays are used, welding rods shall be in accordance with type MIL-RCoCr-A of MIL-R-17131.

3.3.2  Spring materials. On applications where the working temperature of the spring will exceed 600°F, either Inconel X-750 or A-286 alloy steel shall be used. Where the working temperature of the spring exceeds 450°F, but not 600°F, Inconel 600 or tungsten tool steel may also be used. For applications where the working temperature of the spring will not exceed 450°F, 300 series corrosion-resistant steel may be used.

3.4  Valve descriptions. The following is a brief description of the classes A, B, and C:

    (a)  Class A (internal pilot operated). [Loaded (unreadable)] The downstream pressure feedback is sensed by a spring which in turn utilizes line steam pressure to position a small pilot valve which via an operating piston.

    (b)  Class B (inverted, gas loaded, liquid sealed). The downstream pressure is controlled by an air (or other inert gas) loaded diaphragm assembly located below the main valve body. The reduced pressure feedback is conducted to the top of the diaphragm, which is protected with a water seal, and compared with the air load to directly position the main throttling valve. The bottom surface of the diaphragm is protected with a glycerin seal.

    (c)  Class C (spring loaded). The downstream pressure feedback is sensed by a spring loaded diaphragm which directly positions the main throttling valve.

3.5  Design and construction.

3.5.1  Design concept. Valves shall be operated, maintained, and repaired onboard Naval ships and therefore design emphasis shall be placed on simplicity, maintainability, ruggedness, and reliability.

3.5.2  Accessibility. The design and construction of the valves shall afford easy access for adjustment and repair when working from either side of the valve and without requiring removal from the line.

3.5.3  Pressure-temperature ratings.

3.5.3.1  Pressure-temperature ratings (composition A, B, and D). The design and pressure-temperature rating for composition A, B, and D valves shall be in accordance with USAS B16.5 except for maximum allowable temperature. Maximum temperature limitations shall be as follows:

    Composition A  -  1050°F.
    Composition B  -  1000°F.
    Composition D  -  775°F.

3.5.3.2  Pressure-temperature ratings (composition E). Composition E valves shall be designed for a working pressure of 100 pounds per square inch gage (psig) at 425°F.

3.5.4  End preparation. Valves shall be furnished with flanged ends in accordance with USAS B16.5 for composition A, B and D valves and MIL-F-20042 for composition E valves. Flanges shall be cast or forged integral with the valve body and the inlet and outlet flanges shall be of the same size and pressure rating.

3.5.5  Bonnet and bottom cover joints.

3.5.5.1  Bonnet and bottom cover joints - composition A, B, and D.  The bonnet and bottom cover for composition A, B, and D valves shall be flanged for attachment to the body. These joints shall be secured by either of the following:

(a)  Through bolts threaded the entire length and fitted with a nut on each end.  Threads on both bolts and nuts shall be class 2 fit in accordance with Handbook H28.

(b)  Tap-and studs with interference fit at the tap end and a class 2 fit at the nut end.  Interference fit shall be in accordance with USAS B1.12.

The bonnet and bottom cover shall be located by body guiding (i.e. a close tolerance fit between machined diameters on the body, bonnet, and bottom cover) rather than depending on studs or bolts for location.  Spiral wound gaskets shall be fully retained and the joints shall have metal-to-metal take-up to provide controlled compression of the gaskets. Joint design shall assure parallel alignment of the guide bushings.  Sufficient bolting area shall be provided to maintain metal-to-metal make-up over at least a 3 year period. Bearing surface of nuts and their respective surfaces on the valve shall be finished machined.

3.5.5.2  Bonnet and bottom cover joints - composition E.  Composition E valves in sizes 1-1/2 inches and below may utilize straight machine threaded and gasketed joints. All sizes of composition E valves may utilize joints in accordance with 3.5.5.1 or joints secured with cap screws.  Joint design shall assure proper alignment of the guide bushings. The bearing surfaces of nuts and bolts and their respective surfaces on the valve shall be cast smooth and true without nut interference or shall be finished machined.

3.5.6  Internal trim.  All internal trim (except welded or brazed in seat rings) shall be readily replaceable without requiring removal of the valve body from the line.  The main plug or disc shall be single seated and top and bottom guided.  The guiding surfaces (bushings and posts) shall have the proper hardness, finish, concentricity, parallelism, clearances, length and rigidity to prevent binding or seizing and to insure proper seating under all design conditions.  These alignment requirements shall be maintained with interchangeable parts and under any tolerance stack-up condition.  Where quick change cage trim is specified (see 6.2), the seat ring shall be gasket sealed and retained by way of the bonnet or bottom cover bolting.  Where cage trim is not specified, and where a separate seat ring is provided, it shall be seal welded or brazed circumferentially on valves used at 225 psig steam pressure and above.

3.5.7  Gaskets.  Spiral wound gaskets shall retain sufficient residual load in service to maintain a leak-tight joint over at least a 3 year period.

3.5.8  Interchangeability.  All parts having the same manufacturer's part number shall be directly interchangeable with each other with respect to installation and performance without requiring selection or fitting.

3.5.9  Spring design.  Springs shall be designed so that they will not be compressed solid during any operation of the valve.  Spring ends shall be squared and ground.  When removed from the valve and compressed solid, the spring shall not exhibit a permanent set exceeding 0.010 inches per inch of spring length, measured ten minutes after release of the spring.

3.5.10  Threads.  All threads shall conform to Handbook H28.  Where necessary, provisions shall be incorporated to prevent the accidental loosening of threaded parts.  Pipe threads shall not be used.  The design shall be such that standard wrenches can be used on all external bolting.

3.5.11  Body construction.  Valves shall be of basic globe configuration with inline inlet and outlet ports.  All steam pressure lines, except for the external downstream pressure sensing line (where used), shall be internally ported in the body and bonnet.  Body passages shall be designed to produce gradual changes in flow direction so as to reduce any effects of concentrated impingement and 90 degree turns.  In portions of the valve subject to velocity increases and flow direction changes, such as immediately down stream of the seat, the design shall eliminate direct impingement against the walls at close range.

3.5.12  Control connections.  Where external downstream sensing is used, a 1/2 inch IPS flanged connection which is either cast or forged integral with the body or bonnet, welded (for composition A, B, and D valves) or brazed (for composition E) shall be provided.

5

MIL-V-17848b(SHIPS)

3.5.13  Set point adjustment. Means shall be provided for adjusting the set point through the specified range, with the valve under pressure. The adjusting or loading device shall be safeguarded against accidental change in set point. Unless otherwise specified (see 6.2), class A and C valves shall be adjustable over a range of at least 75 to 125 percent of the specified set pressure and class B valves shall be adjustable between 5 and 100 percent of the maximum set point.

3.5.14  Class A. The operating piston shall be separate from the main valve and shall be fitted with one or more piston rings. Means shall be provided for drainage of water from the top of the operating piston. The pilot valve and diaphragm chambers shall be self draining. The pilot valve shall be single seated, integral with the pilot valve stem, and cone shaped. The valve shall be controlled by a spring referenced metal diaphragm and shall open against the high pressure. A return spring shall be incorporated to keep pilot valve in contact with the diaphragm at all times. The construction of the pilot section shall be such that the diaphragm does not travel through center at any time during the required valve operation. All edges which contact the diaphragm during operation shall be rounded to prevent damage to the diaphragm. On valves used for steam temperature above 750°F., the main valve return spring shall be recessed in a condensate chamber out of the flow of live steam. The reduced pressure sensing line shall be internal or external as specified (see 6.2).

3.5.15  Class B. The diaphragm chamber shall be located below the valve body and a water seal shall be provided for the upper surface of the diaphragm and a glycerin seal for the lower surface of the diaphragm to prevent exposure to steam or air. The upper diaphragm chamber shall constitute a reservoir for the supply of water and the design shall not rely on condensation to form an initial protective seal. The construction shall be such that the temperature of the diaphragm does not exceed 180°F. with an ambient temperature of 110°F. A loading fitting which permits loading, bleeding, and isolation of the lower diaphragm chamber shall be provided. A pressure gage with a range from zero to approximately 150 percent of the maximum pressure to which the chamber will be charged to obtain the highest set pressure, shall be provided and attached to the loading fitting. A relief valve shall be provided on the loading fitting to prevent charging the diaphragm chamber beyond its design pressure. All air connections shall be straight thread and O-ring seal construction in accordance with MS16142. All pneumatic attachments shall be protected from external damage or mishandling with a sturdy guard. The entire diaphragm chamber shall be securely attached to the bottom of the valve to prevent any damage from shock or whip. Where specified (see 6.2) diaphragm chamber charging equipment, with the necessary tubing and fittings, and suitable for charging to the maximum set point of the regulator, shall be provided.

3.5.16  Class C. Valves shall incorporate a metal diaphragm which has sufficient strength and flexibility to meet the specified performance requirements and provide extended service (at least three years) under the operating conditions. Class C valves shall be limited to set pressures of 50 psig and below.

3.6  Performance requirements.

3.6.1  Accuracy of regulation. The valve shall have an accuracy of regulation, as defined in 3.2.1, as specified (see 6.2).

3.6.2  Capacity requirements. The actual steam flow capacity required, in pounds per hour, based on the minimum inlet pressure and highest reduced pressure setting under which the valve will be required to operate shall be as specified (see 6.2). The valve shall meet the specified capacity requirement, or any intermediate capacity requirement down to 10 percent of the specified capacity requirement, and shall operate without hunting, chattering, or excessive noise or vibration, or exceeding the accuracy of regulation specified in 3.6.1, under all specified operating conditions.

3.6.3  Range of adjustment. Valves shall be capable of meeting the performance requirements specified in 3.6.1 and 3.6.2 when set at any point within the required range of set pressure adjustment.

3.6.4  Seat tightness. With a dead-end downstream volume not exceeding the volume represented by 100 diameters of downstream pipe, any steam leakage from the inlet to the outlet of the valve shall be limited below a valve which will cause a discharge pressure buildup of more than 10 pounds per square inch (psi) in a 1 hour period.

3.6.5  External leakage. There shall be no external leakage which can be detected by use of a mirrored surface.

6

*See Amend 4*

MIL-V-17848D(SHIPS)

3.6.4 Mechanical shock and vibration. Valves shall be designed to meet the mechanical shock requirements defined by grade A, class I of MIL-S-901 and the environmental vibration requirements defined by type I of MIL-STD-167. Requirements for shock and vibration testing shall be as specified (see 6.2).

3.7 Marking.

3.7.1 Body markings. The manufacturer's name or trademark and the body material composition shall be cast or forged integral with the valve body. The size, rating, and a flow arrow or "inlet" and "outlet" shall be cast or forged integral with the valve body or stamped on the O.D. of the flanges.

3.7.2 Identification plates. Each valve shall have an identification plate permanently attached to an exposed position on the valve that will not be covered by insulation. The identification plate shall be made of corrosion-resistant material and shall contain the following information or a space therefor:

    (a)  Manufacturer's name
    (b)  MIL-V-17848 and class
    (c)  USAS rating
    (d)  Adjustable set pressure range
    (e)  Manufacturer's model and part number
    (f)  ~~CID number~~ —— (Amend 4)
    (g)  Space for 9 digit CID number

3.8 Drawings.   *See Amend 4*

3.8.1 Preliminary drawings. Preliminary drawings which are sufficient to permit evaluation of the design and approval of materials, shall be submitted with bids to the procuring activity. These drawings shall show the following:

    (a)  Accurately scaled sectional assembly which clearly depicts the design and construction of the valve.
    (b)  Bill of material listing specification, grade, condition, and any other data required to fully identify the properties of the materials proposed.
    (c)  Details of the seat, disc, and stem assembly and all other replaceable internal trim.
    (d)  Outline dimensions, disassembly space, location and size of end connections and mounts and any other dimensions pertinent to installation.
    (e)  Estimated weight and any limitations on installation.
    (f)  Table of spring data (where applicable).
    (g)  Reference to any previous applicable shock and vibration approval for valve and test report numbers.
    (h)  Recommended assembly torques, or equivalent procedures, (or making up all joints and threaded assemblies.
    (i)  Tabulation of required gasket characteristics including all dimensions (with tolerances) and load versus compression characteristics (with tolerances).
    (j)  Mark areas to be radiographic, magnetic particle, or dye penetrant inspected.

3.8.2 Final drawings. Final drawings and certification data sheets shall be submitted to the procuring activity for approval within 60 days after date of contract. These drawings shall be in accordance with types II and III of MIL-D-1000/2 except for extent of detail. Only the information required in 3.8.1 need be furnished for the type II drawings. The following data, in addition to that required in MIL-D-1000/2, shall be furnished for the type III drawings:

    (a)  Ship identification.
    (b)  Applicable assembly drawing number(s).
    (c)  Applicable manual number.
    (d)  CID (APL) number.
    (e)  Application description including (i) through (m) of 6.2.
    (f)  Valve description.
    (g)  The set pressure and adjustable range of valve.
    (h)  Required accuracy of regulation over specified range of operating conditions.
    (i)  Rated accuracy of regulation over specified range of operating conditions.
    (j)  Required maximum capacity under specified conditions.
    (k)  Rated maximum capacity under specified conditions.
    (l)  Fail-open capacity (for purposes of relief valve sizing).
    (m)  All deviations from assembly drawing.

7

MIL-V-17848B(SHIPS)

*See Amend 4*

3.8.3 Limited rights legend. When the Government has only limited rights in the data shown on the drawings, as determined by the contractual provisions regarding rights in technical data, the drawings furnished may be marked with the following restrictive legend:

"Furnished under United States Government Contract No. _____. Shall not be either released outside the Government, or used, duplicated, or disclosed in whole or in part for manufacture or procurement, without the written permission of _____, except for: (a) emergency repairs or overhaul work reasonably available to enable timely performance of the work; or (b) release to a foreign government, as the interests of the United States may require; provided that in either case the release, use, duplication or disclosure hereof shall be subject to the foregoing limitations. This legend shall be marked on any reproduction hereof in whole or in part."

*See Amend 4*

3.9 Manuals. Manuals shall be furnished in accordance with type I of MIL-M-15071. The quantity and distribution of manuals shall be as specified (see 6.2). The following, in addition to that required for type I of MIL-M-15071, shall be included as part of the manual contents:

(a) The approved engineering drawings for the valve (including certification data sheet). These drawings shall be supplemented by additional illustrations where necessary to adequately illustrate operation and maintenance. These additional illustrations may consist of blowouts, partial or full sections, etc., and may eliminate extraneous lines and details to clarify the inter-action of parts.

(b) Table listing wrench sizes and assembly torques (or other equivalent procedures for making up all joints and threaded assemblies.

(c) Instructions to permit overhaul by shipyard or other repair facility. These should include procedures for checking all critical dimensions subject to wear or change and the acceptable dimensional limits, surface finish condition, etc. Also, the appropriate procedure (that is, part replacement, correction at repair facility, or repair at manufacturer's facility) which should be followed to correct each case of damage or wear.

(d) Detailed disassembly and reassembly procedures. In addition to providing procedures for the complete disassembly and reassembly of the equipment, maintenance and troubleshooting sections shall contain, or refer to, only the limited disassembly and reassembly required to accomplish each particular operation. This is intended to reduce the possibility of unnecessary dis-assembly and unnecessary disturbance of adjustments when performing specific or limited maintenance or troubleshooting operations.

(e) Adjustment procedures.

3.10 Workmanship. Valves shall be free from defects affecting either operation or appearance. Workmanship shall be first class in every respect.

4. QUALITY ASSURANCE PROVISIONS

4.1 Responsibility for inspection. Unless otherwise specified in the contract or purchase order, the supplier is responsible for the performance of all inspection require-ments as specified herein. Except as otherwise specified in the contract or order, the supplier may use his own or any other facilities suitable for the performance of the inspec-tion requirements specified herein, unless disapproved by the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies and services conform to prescribed requirements.

*See Amend 4*

4.1.1 Quality program requirements. Reducing valves furnished under this specifica-tion shall be manufactured under a quality program which has been accepted as meeting the requirements of MIL-Q-9858.

4.2 Qualification tests[1]. Qualification tests shall be conducted at a laboratory satisfactory to the Naval Ship Engineering Center (NAVSEC) and shall consist of the ex-amination and tests specified in 4.2.2 through 4.2.10.

---

[1]Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.4 and 6.4.1).

~ See Amend 4

MIL-V-17848B(SHIPS)

4.2.1 Qualification test sample. Each of the following classes and ratings shall require separate qualification testing. The size and composition of the test valve shall be as approved by NAVSEC (Auxiliary Equipment Branch).

Class A -- 150, 600 and 1500 psig ratings
Class B -- 150 and 600 psig ratings
Class C -- 150 and 600 psig ratings

4.2.2 Examination. The valve shall be visually and dimensionally examined to determine conformance with the requirements of this specification and the approved engineering drawings. Particular emphasis shall be placed on the dimensions, finishes, and condition of the guiding and seating surfaces.

4.2.3 Nondestructive tests. Nondestructive tests (radiography, magnetic particle, and dye penetrant) shall be conducted in accordance with MIL-STD-790 and STD-278 (levels 6)

4.2.4 Hydrostatic test. Composition A, B and D valves shall be tested in accordance with USAS B16.5. Composition C valves shall be tested to 200 psig. There shall be no external leakage, permanent distortion or structural failure.

4.2.5 Dead-end test. With an inlet pressure equal to the nominal rating, the outlet pressure in a dead-end volume representing not more than 100 diameters of the downstream pipe, shall not rise more than 10 psi in a 1 hour period.

4.2.6 External leakage test. All pressure containing parts, including the diaphragm chamber for class D valves, shall be tested with steam or air to the maximum working pressure to check for external leakage. There shall be no external leakage which can be detected by use of a mirrored surface (for steam) or bubble fluid (for air).

4.2.7 Performance test. The valve shall be subjected to the tests specified in 4.2.7.1 through 4.2.7.3. Unless otherwise approved, the delivered pressure shall at all times hold within the limits of plus or minus 5 percent or plus or minus 2 psi, whichever is greater. There shall be no evidence of hunting, chattering or any other unstable or unsatisfactory operation of the valve during any portion of these tests. The test specified in 4.2.7.1 and 4.2.7.2 shall be conducted with the valve set at the upper and lower limits of the set pressure range (see 3.5.13).

4.2.7.1 Flow-droop test. The flow shall be varied from lock-up to the maximum flow rating of the valve in not more than 15 seconds and from the maximum flow rating to lock-up in not more than 15 seconds. This test shall be conducted under the following sets of conditions:

(a) Maximum inlet pressure - lowest set pressure.
(b) Minimum inlet pressure - lowest set pressure.
(c) Minimum inlet pressure - highest set pressure.
(d) Maximum inlet pressure - highest set pressure.

Unless otherwise approved, the maximum inlet pressure for these tests shall be equal to the rating of the valve and the minimum inlet pressure for these tests shall be equal to 75 percent of the rating of the valve.

4.2.7.2 Inlet pressure transient. With a constant flow demand equal to 10, 50 and 100 percent of the maximum, the inlet pressure shall be varied from 75 percent to 100 percent of the inlet rating in not more than 5 seconds and from 100 percent to 75 percent of the inlet rating in not more than 5 seconds.

4.2.7.3 Endurance test. Following the tests of 4.2.7.1 and 4.2.7.2, the valve shall be subjected to a 20 hour operational test to check functioning and performance.

4.2.8 High-impact shock test. The valve shall be subjected to the high-impact mechanical requirements for grade A, class 1 of MIL-S-901.

4.2.9 Vibration test. The valve shall be vibration tested in accordance with type I of MIL-STD-167.

4.2.10 Post test examination. After completion of the tests specified in 4.2.3 through 4.2.9, the test valve shall be disassembled and visually and dimensionally examined. Any damage, excessive wear, or signs of galling or pitting shall be cause for rejection.

9

MIL-V-17646B (SHIPS)

4.3 First unit examination and tests. The first valve of the same class and rating and intended for the same basic shipboard application, furnished under a contract or order shall undergo the first unit examination and tests specified in 4.3.1 through 4.3.5. First unit examination and tests will be waived on subsequent orders for the same equipment and basic application. First unit tests may also be waived where the manufacturer has sufficient verifiable evidence based on test data or previous shipboard experience or both with the same or similar application to satisfactorily demonstrate that the valve proposed will meet all contract requirements and is suitable for the intended shipboard application. All subsequent valves of the same class and rating and intended for the same basic shipboard application furnished shall undergo quality conformance inspection specified in 4.4  — 4.5 (Amendment 4)

4.3.1  Examination. Valves shall be examined as specified in 4.2.2.

4.3.2  Hydrostatic test. Valves shall be hydrostatic tested as specified in 4.2.4.

4.3.3  Dead-end test. Valves shall be dead-end tested as specified in 4.2.5.

4.3.4  External leakage. Valves shall be tested for external leakage as specified in 4.2.6.

4.3.5  Performance test. The tests specified in 4.3.5.1 and 4.3.5.2 shall be conducted with the valve set at the upper and lower setting of the adjustable set pressure range required by the application (see 6.2). The maximum inlet temperature, the range of operating inlet pressures, the maximum rate of change of the inlet pressure, the maximum flow capacity required, and the maximum rate of change of flow demand shall be as specified (see 6.2) to meet the application requirements. The required accuracy of regulation shall be maintained and there shall be no evidence of hunting, chattering, or any other unstable or unsatisfactory operation of the valve over any portion of the required operational range of the valve.

4.3.5.1  Flow-droop test. The flow shall be varied from lock-up to the maximum flow rating and back at the rate specified (see 6.2). This test shall be conducted under the following sets of conditions:

  (a)  Maximum inlet pressure - lowest set pressure.
  (b)  Minimum inlet pressure - lowest set pressure.
  (c)  Minimum inlet pressure - highest set pressure.
  (d)  Maximum inlet pressure - highest set pressure.

4.3.5.2  Inlet pressure transient. With a constant flow demand equal to 10, 50 and 100 percent of the maximum, the inlet pressure shall be varied over the specified range at the maximum rate specified (see 6.2). See Amend 4 for 4.3.5.3 + 4.3.6 (new)

4.4  Sampling for quality conformance inspection.

4.4.1  Lot. All valves of the same class, rating, composition and size, offered for delivery at one time shall be considered a lot for the purpose of sampling.

4.4.2  Sampling for visual and dimensional examination. A random sample of valves shall be selected from each lot in accordance with table II and shall be examined as specified in 4.5.1.1 and 4.5.1.2. Failure of any valve in the sample to pass the examination specified in 4.5.1.1 and 4.5.1.1 shall be cause for rejection of the lot.

Table II - Sampling for visual
and dimensional examination

| Lot size | Sample quantity |
|----------|-----------------|
| 2 to 25 | 1 |
| 26 to 65 | 2 |
| 66 to 180 | 3 |
| Over 180 | 4 |

10

BEST COPY AVAILABLE

MIL-V-17848B(SHIPS)

4.4.3  Sampling for tests.  A random sample of valves shall be selected from each lot in accordance with table III and shall be tested as specified in 4.5.2.  If the number of rejected valves in any sample exceeds the acceptance number specified in table III the lot represented by the sample shall be subject to rejection.  If the sample size specified in table III equals or exceeds the lot size, the lot shall undergo 100 percent inspection.

Table III - Sampling for tests.

| Lot size | Sample size | Allowable number rejects |
|----------|-------------|--------------------------|
| 2 to 8 | 5 | 0 |
| 9 to 15 | 7 | 0 |
| 16 to 25 | 10 | 0 |
| 26 to 40 | 15 | 0 |
| 41 to 65 | 25 | 0 |
| 66 to 110 or over | 35 | 1 |

4.5  Quality conformance inspection.

4.5.1  Examination.

4.5.1.1  Visual examination.  A visual examination shall be made of the sample valves selected in accordance with 4.4.2 to verify conformance to the requirements of this specification.

4.5.1.2  Dimensional examination.  A dimensional examination shall be made on the sample valves selected in accordance with 4.4.2 to verify conformance with the approved drawings.

4.5.2  Tests.

4.5.2.1  Nondestructive tests.  Nondestructive tests shall be conducted as specified in 4.2.3.

4.5.2.2  Hydrostatic test.  Each of the sample valves selected in accordance with 4.4.3 shall be hydrostatic tested as specified in 4.2.4.

4.5.2.3  Dead-end test.  Each of the sample valves selected in accordance with 4.4.3 shall be dead-end tested as specified in 4.2.5.

4.5.2.4  External leakage.  Each of the sample valves selected in accordance with 4.4.3 shall be tested for external leakage as specified in 4.2.6.

4.5.3  Material verification.  Where level I MIC requirements are invoked (see 6.2), material identification and control shall be in accordance with NAVSHIPS 0948-045-7010.

4.6  Inspection of preparation for delivery.  The packaging, packing and marking shall be inspected for compliance with section 5 of this document.

5.  PREPARATION FOR DELIVERY

(The preparation for delivery requirements specified herein apply only for direct Government procurements.)

5.1  Sub-contracted material and parts.  The preparation for delivery requirements of referenced documents listed in section 2 do not apply when material and parts are procured by the supplier for incorporation into the equipment and lose their separate identity when the equipment is shipped.

5.2  Domestic shipment and early equipment installation (see 5.4).

5.2.1  Valves.

5.2.1.1  Preservation and packaging.  Preservation and packaging which may be the supplier's commercial practice, shall be sufficient to afford adequate protection against corrosion, deterioration and physical damage during shipment from the supply source to the using activity and until early installation.

11

MIL-V-17848B(SHIPS)

5.2.1.2 Packing. Packing shall be accomplished in a manner which will insure acceptance by common carrier at the lowest rate and will afford protection against physical or mechanical damage during direct shipment from the supply source to the using activity for early installation. The shipping containers or method of packing shall conform to the Uniform Freight Classification Rules or other carrier regulations as applicable to the mode of transportation and may conform to the supplier's commercial practice.

5.2.1.3 Marking. Shipment marking information shall be provided on interior packages and exterior shipping containers in accordance with the contractor's commercial practice. The information shall include nomenclature, Federal stock number of manufacturer's part number, contract or order number, contractor's name and destination.

5.3 Domestic shipment and storage or overseas shipment requirements. The requirements and levels of preservation, packaging, packing and marking for shipment shall be specified by the procuring activity (see 5.4 and 6.2).

5.4 Use of polystyrene (loose-fill) material.

5.4.1 For domestic shipment and early equipment installation and level C packaging and packing. Unless otherwise approved by the procuring activity (see 6.2), use of polystyrene (loose-fill) material for domestic shipment and early equipment installation and level C packaging and packing applications such as cushioning, filler and dunnage is prohibited. When approved, unit packages and containers (interior and exterior) shall be marked and labelled as follows:

"CAUTION

Contents cushioned, etc. with polystyrene (loose-fill) material.
Not to be taken aboard ship.
Remove and discard loose-fill material before shipboard storage.
If required, recushion with cellulosic material bound fiber,
fiberboard or transparent flexible cellular material."

5.4.2 For level A packaging and level A and B packing. Use of polystyrene (loose-fill) material is prohibited for level A packaging and level A and B packing applications such as cushioning, filler and dunnage.

6. NOTES

6.1 Intended use. Pressure reducing valves covered by this specification are intended for line steam pressure reducing service onboard ship.

6.2 Ordering data. Procurement documents should specify the following:

(a) Title, number and date of this specification.
(b) Class and composition required (see 1.2).
(c) Trim materials where specific requirement is known (see 3.3.1).
(d) Quick change cage trim, when required (see 3.5.6).
(e) Adjustable range of reduced pressure settings required, if other than specified in 3.5.13.
(f) Whether internal or external reduced pressure sensing line is required (see 3.5.14).
(g) Charging equipment to be supplied with class B valves (see 3.5.15).
(h) Accuracy of regulation required (see 3.6.1).
(i) Minimum and maximum inlet pressures (psig) (see 3.6.2 and 4.3.5).
(j) Maximum rate of inlet pressure variation (psi/second) where known (see 4.3.5).
(k) Maximum inlet steam temperature (°F) (see 4.3.5).
(l) Maximum and minimum capacity required (pounds/hour) (see 4.3.5).
(m) Maximum rate of flow demand variation (pounds/hour/second) where known (see 4.3.5 and 4.3.5.3).
(n) Shock and vibration testing requirements (see 3.6.6).
(o) Manuals (quantity and distribution) (see 3.9).
(p) Flow rate required (see 4.3.5.1).
(q) Whether level I MIC is required (see 4.5.3).
(r) Preservation, packaging, packing and marking requirements, if other than specified in 5.2 (see 5.3).
(s) When polystyrene "loose-fill" is approved (see 5.4).
(t) Brief description of application and any special performance   construction requirements.

12

MIL-V-17848B(SHIPS)

6.3  This specification covers only pressure reducing valves (formerly "type I of MIL-V-17848A(SHIPS)). Type II valves of revision A have been ... . Series (pressure and temperature ratings) have been replaced by USAS B16.5 ratings.  Other classification has been changed as follows:

| Revision A | Revision B |
|---|---|
| --- | Class A |
| Class B | Same |
| Class A | Class C |
| Class C | Deleted |

6.4  With respect to products requiring qualification, awards will be made only for products which are at the time set for opening of bids, qualified for inclusion in applicable Qualified Products List 17848 whether or not such products have actually been so listed by that date.  The attention of the suppliers is called to this requirement, and manufacturers ar. .,un. to arrange to have the products that they propose to offer to the Federal Government tested for qualification, in order that they may be eligible to be awarded contracts or orders for the products covered by this specification.  The activity responsible for the qualified products list is the Naval Ship Engineering Center, Department of the Navy, Washington, D.C. 20360, and information pertaining to qualification of products may be obtained from that activity.  Application for Qualification tests shall be made in accordance with "Provisions Governing Qualification SD-6" (see 6.'.1).

6.4.1  Copies of "Provisions Governing Qualification SD-6" may be obtained upon application to Commanding Officer, Naval Publications and . "." . Center, 5801 Tabor Avenue, Philadelphia, Pennsylvania 19120.

6.5  CHANGES FROM PREVIOUS ISSUE.  THE OUTSIDE MARGINS OF THIS DOCUMENT HAVE BEEN MARKED "#" TO INDICATE WHERE CHANGES (DELETIONS, ADDITIONS, ETC.) FROM THE PREVIOUS ISSUE HAVE BEEN MADE.  THIS HAS BEEN DONE AS A CONVENIENCE ONLY AND THE GOVERNMENT ASSUMES NO LIABILITY WHATSOEVER FOR ANY INACCURACIES IN THESE NOTATIONS.  BIDDERS AND CONTRACTORS ARE CAUTIONED TO EVALUATE THE REQUIREMENTS OF THIS DOCUMENT BASED ON THE ENTIRE CONTENT AS WRITTEN IRRESPECTIVE OF THE MARGINAL NOTATIONS AND RELATIONSHIP TO THE LAST PREVIOUS ISSUE.

Preparing activity:
Navy - SH
(Project 4820-N193)

# EXHIBIT B

CERTIFICATE OF CONFORMANCE
MANUFACTURER OF PRESSURE, TEMPERATURE AND LIQUID LEVEL STRAINERS, STEAM AND AIR WHISTLES

LESLIE COMPANY MANUFACTURER & DERRICK CO.
LESLIE ORDER NO. _____

PARSONS KINGS, VIRGINIA

QUAN. SHIPPED _____ 1
DESCRIPTION __ 1" DDOMSX 900# DCV

CUSTOMER ORDER NO. __594K-6440-K3__
MFG. AUTHORIZED BY ____ CUSTOMER

DATE __9.21.71__    ITEM NO. __18.0__
DWG. APPROVAL _____ YES ☒  NO ☐

THE ABOVE REFERENCED PRODUCT UNITS HAVE PASSED QUALITY ASSURANCE INSPECTIONS AND TESTS AS FOLLOWS:

☒ VISUAL INSPECTION — CONFORMANCE TO WORKMANSHIP, APPEARANCE STANDARDS.

☒ DIMENSIONAL INSPECTION — CONFORMANCE TO DWG. __22948N__    C.D. NO. __22959N__

☒ MATERIAL INSPECTION — MTL. IN ACCORDANCE WITH DWG. AND/OR SPECIFICATIONS.

☒ CHEMICAL COMPOSITION AND MECHANICAL PROPERTIES TEST

☒ RADIOGRAPHIC EXAMINATION:    CLASS 1 ——— ☒, CLASS 2 ——— ☐, ——— ☐

☒ MAGNETIC PARTICLE TEST

☒ LIQUID PENETRANT TEST   SEATS & WELDS

☒ PRESERVATION, MARKING, PACKAGING AND PACKING INSPECTION — CONFORMANCE TO SPEC. NO. _____

☒ PRESSURE TEST: HYDROSTATIC _____3250_____ P.S.I. _____ AIR _____ P.S.I.

☒ SEAT TIGHTNESS TEST:  AIR _____ P.S.I.    BUILD-UP _____ P.S.I.
                        WATER __1090__ P.S.I.    BUILD-UP _____ P.S.I.
                        STEAM _____ P.S.I.    BUILD-UP _____ P.S.I.

☒ PERFORMANCE TEST:  AIR _____ P.S.I.    SETTING _____ P.S.I.
                     STEM WATER __1090__ P.S.I.    SPAN _____ P.S.I.
                     DISCHARGE PRESSURE (PUMP GOVERN.) _____ P.S.I.

☒ OTHER TESTS:   POST SHOCK & VIBRATION INSPECTION & TEST   N. J. Raymond
EXCEPTIONS AND VARIATIONS: _____   DCASD QAS
_____   11/12/71

INSPECTED BY __G. Gillespie__    TESTED BY __J. Wahlberg__
DATE __9/21/71__    DATE __9/21/71__

☒ PRODUCT LISTED ABOVE HAS BEEN INSPECTED AND TESTED IN ACCORDANCE WITH SPECIFICATIONS CALLED FOR, AND HAS BEEN FOUND TO MEET ALL APPLICABLE CONTRACT REQUIREMENTS.

☐ TEST REPORTS ARE ON FILE, SUBJECT TO EXAMINATION AT OUR SOURCE.

☐ MATERIAL IS CERTIFIED
☐ _____   By __J. McDonough__   DATE __9/22/71__
☐ _____   Quality Control Manager

MIL–I–45208A
16 DECEMBER 1963
SUPERSEDING

MIL–I–45208 (ARMY)
13 OCTOBER 1961
NPD (NAVEXOS P–1034)
APPENDIX A (In Part)
26 FEBRUARY 1960

## MILITARY SPECIFICATION

# INSPECTION SYSTEM REQUIREMENTS

*This specification has been approved by the Department of Defense and is mandatory for use by the Departments of the Army, the Navy, the Air Force and the Defense Supply Agency.*

## 1. SCOPE

1.1 Scope. This specification establishes requirements for contractors' inspection systems. These requirements pertain to the inspections and tests necessary to substantiate product conformance to drawings, specifications and contract requirements and to all inspections and tests required by the contract. These requirements are in addition to those inspections and tests set forth in applicable specifications and other contractual documents.

1.2 Applicability.

1.2.1 *Applicability.* This specification shall apply to all suppliers or services when referenced in the item specification, contract or order.

1.2.2 *Relation to Other Contract Requirements.* The inspection system requirements set forth in this specification shall be satisfied in addition to all detail requirements contained in the statement of work or in other parts of the contract. The contractor is responsible for compliance with all provisions of the contract and for furnishing specified articles which meet all requirements of the contract. To the extent of any inconsistency between the contract schedule or its general provisions and this specification the contract schedule and the general provisions shall control.

1.2.3 *Options.* This specification contains fewer requirements than specification MIL–

Q–9858, Quality Program Requirements. The contractor may use, at his option, the requirements of MIL–Q–9858, in whole or in part, whenever this specification is specified, provided no increase in price or fee is involved. This option permits one uniform system in the event the contractor is already complying with MIL–Q–9858.

## 2. APPLICABLE DOCUMENTS

2.1 The following documents of the issue in effect on date of invitations for bids form a part of this specification to the extent specified herein.

SPECIFICATIONS
  MILITARY
    MIL–Q–9858    Quality Program Requirements
    MIL–C–45662    Calibration System Requirements

2.2 Amendments and Revisions. Whenever this specification is amended or revised subsequent to its contractually effective date, the contractor may follow or authorize his subcontractors to follow the amended or revised document provided no increase in price or fee is required. The contractor shall not be required to follow the amended or revised document except as a change in contract. If the contractor elects to follow the amended or revised document, he shall notify the Contracting Officer in writing of this election. When the contractor elects to follow the provisions of an amendment or revision, he must follow them in full.

1

MIL–I–45208A

2.3 **Ordering Government Documents.** Copies of specifications, standards and drawings required by contractors in connection with specific procurements may be obtained from the procuring agency or as otherwise directed by the Contracting Officer.

3. **REQUIREMENTS**

3.1 **Contractor Responsibilities.** The contractor shall provide and maintain an inspection system which will assure that all supplies and services submitted to the Government for acceptance conform to contract requirements whether manufactured or processed by the contractor, or procured from subcontractors or vendors. The contractor shall perform or have performed the inspections and tests required to substantiate product conformance to drawing, specifications and contract requirements and shall also perform or have performed all inspections and tests otherwise required by the contract. The contractor's inspection system shall be documented and shall be available for review by the Government Representative prior to the initiation of production and throughout the life of the contract. The Government at its option may furnish written notice of the acceptability or non-acceptability of the inspection system. The contractor shall notify the Government Representative in writing of any change to his inspection system. The inspection system shall be subject to disapproval if changes thereto would result in nonconforming product.

3.2 Documentation, Records and Corrective Action.

3.2.1 *Inspection and Testing Documentation.* Inspection and testing shall be prescribed by clear, complete and current instructions. The instructions shall assure inspection and test of materials, work in process and completed articles as required by the item specification and the contract. In addition, criteria for approval and rejection of product shall be included.

3.2.2 *Records.* The contractor shall maintain adequate records of all inspections and tests. The records shall indicate the nature and number of observations made, the number and type of deficiencies found, the quantities approved and rejected and the nature of corrective action taken as appropriate.

3.2.3 *Corrective Action.* The contractor shall take prompt action to correct assignable conditions which have resulted or could result in the submission to the Government of supplies and services which do not conform to (1) the quality assurance provisions of the item specification, (2) inspections and tests required by the contract, and (3) other inspections and tests required to substantiate product conformance.

3.2.4 *Drawings and Changes.* The contractor's inspection system shall provide for procedures which will assure that the latest applicable drawings, specifications and instructions required by the contract, as well as authorized changes thereto, are used for fabrication, inspection and testing.

3.3 **Measuring and Test Equipment.** The contractor shall provide and maintain gages and other measuring and testing devices necessary to assure that supplies conform to the technical requirements. In order to assure continued accuracy, these devices shall be calibrated at established intervals against certified standards which have known valid relationships to national standards. If production tooling, such as jigs, fixtures, templates, and patterns is used as a media of inspection, such devices shall also be proved for accuracy at established intervals. Calibration of inspection equipment shall be in accordance with MIL–C–45662. When required, the contractor's measuring and testing equipment shall be made available for use by the Government Representative to determine conformance of product with contract requirements. In addition, if conditions warrant, contractor's personnel shall be made available for operation of such devices and for verification of their accuracy and condition.

3.4 **Process Controls.** Process control procedures shall be an integral part of the inspection system when such inspections are a part of the specification or the contract.

3.5 Indication of Inspection Status. The

2

contractor shall maintain a positive system for identifying the inspection status of supplies. Identification may be accomplished by means of stamps, tags, routing cards, move tickets, tote box cards or other control devices. Such controls shall be of a design distinctly different from Government inspection identification.

**3.6 Government-furnished Material.** When material is furnished by the Government, the contractor's procedures shall include as a minimum the following:

(a) Examination upon receipt, consistent with practicability, to detect damage in transit;

(b) Inspection for completeness and proper type;

(c) Periodic inspection and precautions to assure adequate storage conditions and to guard against damage from handling and deterioration during storage;

(d) Functional testing, either prior to or after installation, or both, as required by contract to determine satisfactory operation;

(e) Identification and protection from improper use or disposition; and

(f) Verification of quantity.

**3.6.1** *Damaged Government-furnished Material.* The contractor shall report to the Government Representative any Government-furnished material found damaged, malfunctioning or otherwise unsuitable for use. In the event of damage or malfunction during or after installation, the contractor shall determine and record probable cause and necessity for withholding material from use.

**3.7 Nonconforming Material.** The contractor shall establish and maintain an effective and positive system for controlling nonconforming material, including procedures for the identification, segregation, presentation and disposition of reworked or repaired supplies. Repair of nonconforming supplies shall be in accordance with documented procedures acceptable to the Government. The acceptance of nonconforming supplies is the prerogative of and shall be as prescribed by the Government. All nonconforming supplies shall be positively identified to prevent use, shipment and intermingling with conforming supplies. Holding areas, mutually agreeable to the contractor and the Government Representative, shall be provided by the contractor.

**3.8 Qualified Products.** The inclusion of a product on the Qualified Products List only signifies that at one time the manufacturer made a product which met specification requirements. It does not relieve the contractor of his responsibility for furnishing supplies that meet all specification requirements or for performing specified inspections and tests for such material.

**3.9 Sampling Inspection.** Sampling inspection procedures used by the contractor to determine quality conformance of supplies shall be as stated in the contract or shall be subject to approval by the Government.

**3.10 Inspection Provisions.** Alternative inspection procedures and inspection equipment may be used by the contractor when such procedures and equipment provide, as a minimum, the quality assurance required in the contractual documents. Prior to applying such alternative inspection procdures and inspection equipment, the contractor shall describe them in a written proposal and shall demonstrate for the approval of the Government Representative that their effectiveness is equal to or better than the contractual quality assurance procedure. In cases of dispute as to whether certain procedures of the contractor's inspection system provide equal assurance, the procedures of this specification, the item specification and other contractual documents shall apply.

**3.11 Government Inspection at Subcontractor or Vendor Facilities.** The Government reserves the right to inspect at source supplies or services not manufactured or performed within the contractor's facility. Government inspection shall not constitute acceptance; nor shall it in any way replace contractor inspection or otherwise relieve the contractor of his responsibility to furnish an acceptable end item. When inspection at subcontractors'

MIL–I–45208A

plants is performed by the Government, such inspection shall not be used by contractors as evidence of effective inspection by such subcontractors. The purpose of this inspection is to assist the Government Representative at the contractor's facility to determine the conformance of supplies or services with contract requirements. Such inspection can only be requested by or under authorization of the Government Representative.

3.11.1 *Government Inspection Requirements.* When Government inspection is required, the contractor shall add to his purchasing document the following statement:

"Government inspection is required prior to shipment from your plant. Upon receipt of this order, promptly notify the Government Representative who normally services your plant so that appropriate planning for Government inspection can be accomplished."

3.11.2 *Purchasing Documents.* When, under authorization of the Government Representative, copies of the purchasing document are to be furnished directly by the subcontractor or vendor to the Government Representative at his facility rather than through Government channels, the contractor shall add to his purchasing document a statement substantially as follows:

"On receipt of this order, promptly furnish a copy to the Government Representative who normally services your plant or, if none, to the nearest Army, Navy, Air Force, or Defense Supply Agency inspection office. In the event the representative or office cannot be located, our purchasing agent should be notified immediately."

3.11.3 *Referenced Data.* All documents and referenced data for purchases applying to a Government contract shall be available for review by the Government Representative to determine compliance with the requirements for the control of such purchases. Copies of purchasing documents required for Government inspection purposes shall be furnished in accordance with the instructions of the Government Representative.

3.12 **Receiving Inspection.** Subcontracted or purchased supplies shall be subjected to inspection after receipt, as necessary, to assure conformance to contract requirements. The contractor shall report to the Government Representative any nonconformance found on Government source-inspected supplies and shall require his supplier to coordinate with his Government Representative on corrective action.

3.13 **Government Evaluation.** The contractor's inspection system and supplies generated by the system shall be subject to evaluation and verification inspection by the Government Representative to determine its effectiveness in supporting the quality requirements established in the detail specification, drawings and contract and as prescribed herein.

4. QUALITY ASSURANCE PROVISIONS

This section is not applicable to this specification.

5. PREPARATION FOR DELIVERY

This section is not applicable to this specification.

6. NOTES

6.1 **Intended Use.** This specification will apply to the procurement of supplies and services specified by the military procurement agencies.

6.2 **Order Data.** Procurement documents should specify the title, number and date of this specification.

Custodians:
    Army—Munitions Command
    Navy—Office of Naval Material
    Air Force—Hq USAF
    DSA—Hq DSA

Preparing activity:
    Army—Munitions Command

4

# EXHIBIT C

REQUEST FOR AUTHORITY TO USE

## SECTION A — REQUEST FOR TEST

| 1. TO: | 2. FROM: Mr. F. Mishnekoff - QAR |
|---|---|
| United States Navy Marine Engineering Laboratory Annapolis, Maryland - 21402 | DCASD - Newark c/o Leslie Company 425 Valley Brook Ave. Lyndhurst, N.J. AREA CODE 201-438-8000 |

| 3. PRIME CONTRACTOR AND ADDRESS | 4. MANUFACTURING PLANT NAME AND ADDRESS |
|---|---|
| Warren Pumps, Inc. Warren, Mass. - 01083 Contract Number - NObS 4884 | Leslie Company 425 Valley Brook Ave. Lyndhurst, N.J. - 07071 P.O. Number - R-77103 |

| 5. END ITEM AND/OR PROJECT | 6. SAMPLE NUMBER | 7. LOT NO. | 8. REASON FOR SUBMITTAL | 9. DATE SUBMITTED |
|---|---|---|---|---|
| GOVERNOR, PUMP | 1 | 1 | Special requests (see remarks) | 9/22/66 |

| 10. MATERIAL TO BE TESTED | 10A. QUANTITY SUBMITTED | 11. QUANTITY REPRESENTED | 12. SPEC. & AMEND. AND/OR DRAWING NO. AND REV. FOR SAMPLE & DATE |
|---|---|---|---|
| GOVERNOR 1" PLNS-5 | 1 | 2 | MIL-G-18916 - AMEND. #2 |

| 13. PURCHASED FROM OR SOURCE | 14. SHIPMENT METHOD | 15. DATE SAMPLED AND SUBMITTED BY |
|---|---|---|
| | MTR FRT PPD | F. Mishnekoff 9/22/66 |

16. REMARKS AND/OR SPECIAL INSTRUCTIONS AND/OR WAIVERS

Submitted for performance tests in accordance with Paragraph 4.3.
1" Leslie Class PLNS-5 Navy Type CP, Class 1, Series 600
Service - Standby Lube Oil Pump

(See page 2 for operating conditions).

17. SEND REPORT OF TEST TO    Mr. F. Mishnekoff - QAR.  c/o Leslie Company
                              DCASD - Newark            425 Valley Brook Ave.
                                                        Lyndhurst, N.J.

## SECTION B — RESULTS OF TEST

| 1. DATE SAMPLE RECEIVED | 2. DATE RESULTS REPORTED | 3. LAB. REPORT NO. |
|---|---|---|
| | | |

| 4. TEST PERFORMED | RESULTS OF TEST | SAMPLE RESULT | | REQUIREMENTS |
|---|---|---|---|---|
| | | | | |

(Continue on plain white paper if more than is required)

| DATE | DAY | TYPED NAME AND TITLE OF PERSON CONDUCTING TEST | SIGNATURE |
|---|---|---|---|
| | | | |

REPLACES DD FORM 1222, 1 JUL 59, WHICH IS OBSOLETE

# EXHIBIT 2

1   MICHAEL PIETRYKOWSKI  (SBN 118677)
    MPIETRYKOWSKI@GORDONREES.COM
2   JAMES SCADDEN (SBN 90127)
    JSCADDEN@GORDONRESS.COM
3   GLEN R. POWELL (SBN 219453)
    GPOWELL@GORDONREES.COM
4   GORDON & REES LLP
    Embarcadero Center West
5   275 Battery Street, Suite 2000
    San Francisco, CA 94111
6   (415) 986-5900
    (415) 986-8054
7
    Attorneys For Defendant
8   LESLIE CONTROLS, INC.

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13   HARRY LEMASTER and CAROLYN       )   CASE NO. 3:08-cv-03316-JCS
     LEMASTER,                        )
14                                    )
                Plaintiff,            )   **DECLARATION OF RET. REAR**
15                                    )   **ADMIRAL ROGER B. HORNE IN**
         vs.                          )   **SUPPORT OF REMOVAL FROM**
16                                    )   **STATE COURT TO FEDERAL**
     ALLIS CHALMBERS CORPORATION      )   **COURT OF DEFENDANT**
17   PRODUCT LIABILITY TRUST, *et al.*, )  **LESLIE CONTROLS, INC.**
                                      )
18              Defendants.           )
                                      )
19   ─────────────────────────────────

20

21

22

23

24

25

26

27

28

LECO/1052065/5817590v.1

*Gordon & Rees LLP
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111*

I, Roger B. Horne, Jr., being under penalty of perjury, declare and say:

1.    I am a retired Rear Admiral of the United States Navy, in which I served between 1956 and 1991.

2.    I began my Navy career in 1956, immediately after receiving a Bachelor of Science degree in Naval Engineering from the United States Naval Academy at Annapolis, Maryland. I have also received extensive post-graduate education in naval engineering, including a Master of Science Degree in Mechanical Engineering from the U.S. Naval Postgraduate School, and have taught Naval Engineering as a Visiting Professor at the University of Michigan. Throughout my Navy career, I concentrated in areas of ship design, engineering, construction, overhaul and inspection. Ultimately, I achieved the rank of Chief Engineer and Deputy Commander, Naval Sea Systems Command ("NAVSEA") for Ship Design and Engineering. Prior to that, I served as Deputy Commander, NAVSEA for Facilities and Industrial Management; Commander, Puget Sound Naval Shipyard; Commander, Engineering Duty Officer School; Production and Repair Officer, Mare Island Naval Shipyard; Nuclear Engineering Manager, Puget Sound Naval Shipyard; Nuclear Submarine Inspection Officer, Supervisor of Shipbuilding Office, Ingalls Shipyard and Chief Engineer in the USS Ozboum (DD 846).

3.    In addition to my training and experience in Navy ship construction, as outlined above, I have been recognized for achievements in the field of marine machinery and engineering, and have received three Navy Legion of Merit Awards and three Meritorious Service Awards for Engineering and Industrial Achievement and an award from the Marine Machinery Association.

4.    I submit this Affidavit in support of defendant Leslie Controls, Inc.'s ("Leslie") Notice of Removal to attest to the level of supervision, direction and control exercised by the U.S. Navy over the design and manufacture of equipment, including valves, intended for installation on Navy vessels. In addition, I have personal knowledge of the comprehensive plans, specifications and requirements which governed suppliers like Leslie of equipment for use aboard Navy ships. More particularly, I can attest that any and all work performed on valves

1    built and supplied for these ships by vendors such as Leslie was performed to the requirements

2    specified by the Navy, and that the work was reviewed and inspected by Navy personnel in the

3    vendor's plant.  In many instances during my career I personally inspected equipment, including

4    valves, to verify conformance with the requirements specified, although more immediate

5    supervision typically was exercised by officers and other Navy personnel under my command or

6    the command of NAVSEA or its predecessor, the Bureau of Ships ("BUSHIPS").

7        5.        Valves built for Navy vessels, including Leslie valves, were manufactured

8    according to detailed specifications prepared, written, approved and issued exclusively by the

9    Navy, specifically NAVSEA or BUSHIPS.  In my role as Chief Engineer and Deputy

10    Commander for NAVSEA's Ship Design and Engineering Division, I was personally responsible

11    to the Commander of NAVSEA for developing ship designs and providing overall technical

12    support to the operating fleet, including technical support for the maintenance of Navy ships, and

13    Navy ships under construction.  I was also responsible for maintaining naval ship military

14    specifications and for monitoring compliance with the specifications by all vendors and

15    contractors of naval equipment.  I am fully aware that only valves especially designed and built

16    for U.S Navy combat vessels, including Leslie valves could be installed.

17        6.        The Navy chain of command concerning ship construction involves several layers

18    of authority related to technical and contractual control over Navy shipbuilding.  The Secretary

19    of the Navy [subject to the President and Congress] has ultimate authority over the Navy and

20    Navy shipbuilding; immediately below the Secretary, as has been the case since the creation of

21    NAVSEA, is the Chief of Naval Operations ("CNO"), to whom NAVSEA reports.  Prior to the

22    establishment of NAVSEA, BUSHIPS controlled all combat ship design and construction and

23    reported to the CNO as well as a civilian Assistant Secretary.  Since the creation of NAVSEA,

24    NAVSEA reports to the CNO for all military ship design and construction.  (See Exhibit A & B.)

25        7.        Under the command of NAVSEA, as was the case with BUSHIPS, the Navy's

26    shipbuilding structure was comprised of several divisions and levels of authority concerning ship

27    design, construction, repair and inspection.  Technical and contractual control over shipboard

28    equipment and material was directed by the Commander of Naval Sea Systems and the

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

1    Commander of Naval Supply.  Each of these two organizations had oversight responsibility

2    concerning, among other things, valves built for Navy vessels.  Compliance with the standards

3    and specifications required for valves built for Navy use was directly monitored by Naval

4    Machinery Inspectors under both of these divisions:  the Machinery Inspectors under Naval

5    Supply worked on-site at the vendor's (in this case Leslie Controls, Inc. s') manufacturing

6    facility, and the Machinery Inspectors under Naval Sea Systems Commands carried out their

7    responsibilities at the shipbuilding yards.  Moreover, it was common in my experience for

8    Directors of the Machinery and Propulsion Equipment Groups, who worked for me at times

9    during my career, to inspect the manufacturing process at vendors' plants.

10       8.      In my experience, it was the Machinery Inspectors who exercised primary,

11   frontline control over the work performed for the Navy and government shipyards and

12   governments contract shipyards by vendors such as Leslie in the production of valves and other

13   equipment.  The Naval Machinery Inspectors were responsible for assuring that contractors such

14   as Leslie followed the required contract specifications as they relate to naval machinery.  Further,

15   the Naval Machinery Inspectors would report to their superiors any violations or failures to

16   comply with specifications.

17       9.      The Navy retained the "final say" over the design of any piece of equipment, and

18   made the ultimate decision regarding how to resolve an engineering disagreement between the

19   Navy and an outside supplier.

20       10.     Equipment sold by Leslie during the 1940's, 1950's and 1960's to the United

21   States Navy for use on U.S. Navy ships was always required to comply with the detailed

22   specifications issued by the government.  For example, attached as Exhibit C is a copy of the

23   1968 Military Specification (MilSpec MIL –G -21032, "Gaskets, Metallic Asbestos, Spiral

24   Wound".  These specifications dictated the materials that Leslie was required to use in

25   component parts in the equipment.  These specifications were made part of the contract, and

26   strict compliance therewith was mandatory.

27       11.     In addition, I can attest that the military specifications for valves and other

28   equipment intended for use aboard Navy vessels were drafted, approved and maintained by the

-4-

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

Navy, specifically NAVSEA, to address all aspects of shipboard equipment and materials requirements, including the materials to be used, and any changes to these specifications were made by the Navy. NAVSEA maintained and controlled the MilSpecs largely because it had superior knowledge of the demands and requirements of combat-ready vessels. NAVSEA or BUSHIPS also prepared contract specifications which incorporated the MilSpecs. These specifications reflected the state of the art and the special needs of combat vessels destined for combat with our sailors.

12.     The Navy had unique specifications for valves. The specifications were communicated to valve vendors such as Leslie when the Navy (directly or through its contractors) issued its Request for Proposal for certain equipment.

13.     The Navy specifications also covered the nature of any communication affixed to valves or other equipment supplied to the Navy. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

14.     The Navy would not, and could not permit an equipment manufacturer of supplier to interfere with the Navy's mission by placing warnings on any equipment (or in any instructions or manuals which accompanied the equipment) on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed non-essential, in its unilateral view.

15.     The Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not

-5-

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

1    be included.  Thus, the Navy controlled the decision making with respect to instructions and

2    warnings on every piece of equipment.

3         16.    In addition to specifications regarding design and manufacturing of the equipment

4    itself, the Navy also had detailed specifications that governed the form and content of written

5    materials to be delivered with equipment, including valves, supplied to the Navy.  The Navy was

6    intimately involved with and had final approval of all technical and engineering drawings,

7    operating manuals, safety or hazard information and any other written information that

8    accompanied a piece of equipment.  The Navy determined the nature of hazards to be subject to

9    any precautionary labeling and the content of any such labeling.  In short, the Navy dictated

10   every aspect of the design, manufacture, installation, overhaul, written documentation and

11   warnings associated with its ships and did not permit deviation from any of its contractors.

12        17.    In conclusion, in each and every instance where Leslie contracted with the U.S.

13   Navy for the provision of equipment, the U.S. Navy exercised direction and control over the

14   design, manufacture, inspection and testing of all such equipment.  Pursuant to the terms of all

15   contracts with Leslie entered with the U.S. Navy, the Navy retained authority to direct and

16   control the performance under the terms of the contract.

17        I declare under penalty of perjury under laws of the State of ___WA___ that the

18   foregoing is true and correct, and that if called as a witness, I could competently testify to the

19   foregoing facts, all of which are within my own personal knowledge.

20

21        Executed this _19 7h_ day of March 2008, at _Seabeck  WA_ . \

22                                          _Roger B Horne_

23                                          ROGER B. HORNE, JR.

24

25

26

27

28

**DECLARATION OF RET. REAR ADMIRAL ROGER B. HORNE**

# EXHIBIT A

# Technical and Contractual Control

## Recent Organization





EXHIBIT

# EXHIBIT B

### Definition of Key Position Responsibilities

**Chief of Naval Operations (CNO):** Overall responsibility for accomplishment of the mission of the Navy in the defense of the United States. This includes recommendations for the Naval ship building programs and the readiness of the Operating forces to meet the threat at hand.

**Commander of the Naval Sea Systems Command (COMNAVSEA):** Responsible to the CNO for technical support of Naval ships, ship designs, and ship construction. Responsible for management of the Naval Shipyards and contract administration of ships under construction in private yards.

**Deputy Commander for Ship Design and Ship Systems Engineering:** Responsible to COMNAVSEA and specific project officers for developing ship designs and for overall technical support to the operating fleet, maintenance of ships, and ships under construction. Responsible for the maintenance of Naval ship military specifications. Monitors contractor performance to requirements in the development of new naval machinery being built to specifications developed by his design personnel.

**Director of the Machinery Group:** Responsible to the Deputy Commander for Ship Design and Ship Systems Engineering for technical support of projects involving ship machinery. This includes the development of new designs as well as support of on going ship construction and ships in maintenance and at sea. Responsible for the maintenance of military specifications related to naval machinery. Naval machinery involves auxiliary machinery, as well as, propulsion machinery.

**Director of the Propulsion Branch:** Responsible to the Director of the Machinery Group for propulsion machinery. Is responsible for the technical effort associated with the development and integration of new propulsion systems into ship designs and related support to the operating fleet. Propulsion systems involve steam, diesel and gas turbine. Has cognizance of specifications related to propulsion systems.

**Head Steam Turbine Branch:** Responsible to the Director of the Propulsion Branch for the development on naval turbines and maintenance of life cycle technical support of turbines used in ship designs. Responsible for the maintenance of and designation of specifications to be used in turbine designs being developed by contractors.

**Deputy Commander for Facilities and Industrial Management:** Responsible to COMNAVSEA for oversight of the Naval Shipyards and the Supervisor of Shipbuilding offices located in the private shipyards where naval ships are under construction.

EXHIBIT

Horne 3

Supervisor of Shipbuilding(SUPSHIP): Responsible to COMNAVSEA via the Deputy Commander for Facilities and Industrial Management for the administration of the ship building contracts in the shipyard(s) he is responsible for. Assures ships are built to required specifications. Approves changes to specifications as authorized by the appropriate cognizant NAVSEA technical code and Project Officer.

Head Inspection Department: Responsible to the Supervisor of Shipbuilding for the inspection of Naval ships under construction in the shipyard. Assures by on scene inspections and audits that the navy specifications for the ship are followed. Comments on contractor requests for changes in the contract specifications as requested by other SUPSHIPS departments. Is not authorized to change specifications.

Naval Machinery Inspectors: Specialized inspectors qualified in Naval machinery that are responsible to the Head of the Inspection Department for assuring the, contractor follows the required contract specifications as they relate to Naval machinery. Inspects ship installations and received material from subcontractors including government furnished material such as propulsion equipment. Reports violations to specifications.

Head Contracts/Supply Dept. Progresses government furnished material and manages contract changes. Is authorized after appropriate technical and project management approval to sign contract change documents.

Commander Naval Supply System (COMNAVSUP): Is responsible to the Chief of operations for supply support of the operating fleet and supply functions related to the shipbuilding programs. This includes the maintenance and distribution of repair parts for ships at sea.

Resident Contract Administration Office: Located in the manufacturing plants of contractors under contract with the US Navy to supply equipment. In some cases equipment is under development. Offices are responsible to COMNAVSUP for assurance that equipment is built to the contract technical specifications. In the case of naval machinery these are specified by NAVSEA. Takes part in visits by the Deputy Commander for Ship Design and Ship Systems Engineering to assure contractor performance. Does not have the authority to allow contractor change to technical specifications without approval from NAVSEA and proper contract modification.

Machinery Inspectors: Depending on the size and complexity of contracts administered the resident office may have a staff of inspectors some of which specialize in certain areas such as propulsion machinery. These inspectors follow the contractor's effort and formally report violations to specifications.

### Ship Design and Naval Machinery Military Specifications

Certain military specifications relate to ship and ship equipment. These are maintained by the Naval Sea Systems Command (NAVSEA) formerly the Bureau of Ships. NAVSEA has in its command engineers highly qualified in specialty areas such as steam turbines, gas turbines, reductions gears etc. These engineers have control over the military specifications that concern their area of expertise. In addition, NAVSEA has had an Engineering Standards Sub Group and a Combatant Ship Specifications and General Specifications Division to help manage the large number of specifications (thousands) and contract plans that exist. Changes to specifications are continually under review as new technology and construction techniques evolve.

Changes to specifications must be coordinated with the cognizant technical engineer. Once a contract which references certain specifications is signed with a contractor the cognizant engineer will resolve any questions of interpretations. There must be clear assignment of responsibility for resolving questions. If this does not occur, different interpretations are liable to occur. Once a specification is invoked in a contract no technical changes can be made that violate that specification without the cognizant engineers review.

The reasons for such control is that specifications are frequently very subtle and what is perceived as a minor change can have a disastrous impact. The safety and effectiveness of combatant ships depends to a large extent on adherence to specifications that have evolved by a process of experience and technology advancement. Since ships are very complex, and subject to various opinions as to what are proper requirements, special care is taken to assure proper technical reviews are made before any waivers to the specifications are approved. Such changes are formal, that is in writing.

### The Ship Design/Construction Process

Once a ship is to be designed there are four design phases that take place: feasibility design, preliminary design, contract design and detailed design. A Ship Design and Engineering Director is assigned along with support from cognizant technical codes.

During the feasibility design phase the outlines of several ship configurations will be considered. For the machinery plant, different types of propulsion plants will be considered, and an outline of the space and weight required for each plant determined. There are now four basic plants and several combinations plants that can be put together.

Once a ship concept has been selected as a result of the feasibility study the preliminary design phase will be started. This design phase is done by NAVSEA and results in an engineering description of the ship and its major subsystems. Performance characteristics



EXHIBIT

Hoens 4

and system diagrammatics are developed during this phase. During this phase, for the machinery plant, each cognizant engineer will do tradeoff studies to determine the best combination of machinery that can be used.

Following the preliminary design phase is the contract design phase. During this phase the designers develop a technical package of drawings and specifications that the various shipbuilders can bid on. This process is done in great detail and the cognizant engineers use the appropriate specifications and contract plans at their disposal to convey to the prospective builders how the ship will be built. By using the contract specifications incorporated during the contract design phase NAVSEA solicits for bids to perform the detail design and ship construction. In some cases detail design or part of it may not be done by the final ship builder selected.

During the detail design phase NAVSEA does not relinquish control. NAVSEA is involved in the development and purchasing of government furnished equipment such as the that used in the propulsion plant. They will review and approve change proposals to specifications and monitor progress and performance to requirements in detail through design reviews, by visits to the design agency, and by approving plans and calculations that have been developed.

Once construction of the ship has been started or new machinery development started by a contractor NAVSEA (the Engineering Directorate) will continue to monitor performance by on site visits and reviews to assure work is proceeding in a proper manner, as specified, and to resolve any technical problems that might come up. Any technical changes to the specifications are reviewed for approval by NAVSEA.

# EXHIBIT C

QPL-2781-34
27 May 1966
SUPERSEDES
QPL-2781-33
23 September 1965

# QUALIFIED PRODUCTS LIST
## OF
### PRODUCTS QUALIFIED UNDER MILITARY SPECIFICATION

MIL-I-2781

INSULATION, PIPE, THERMAL

This list has been prepared for use by or for the Government in the procurement of products covered by the subject specification and such listing of a product is not intended in and does not connote indorsement of the product by the Department of Defense. All products listed herein have been qualified to-date. Error of a product in the product as specified in the latest effective issue of the applicable specification. This list is subject to change without notice. Persons or activities most of this specification will be issued by authority. The listing of a product does not release the supplier from compliance with the specification requirements. Use of the information herein for advertising or publicity purposes is expressly prohibited.

The activity responsible for this Qualified Products List is Naval Ship Engineering Center.

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION REFERENCE | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Grade I** | | | |
| Class B | New Careytemp 1800 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. PCM-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45215 Plants: (See address) |
| Class b | Peter | GRF B-32 | Pabco Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plants: Emeryville, Calif. |
| Class b | Caltemp | WEW 910676 | do. |
| Class b | Calsilite | GAS 910272 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class M | JM (GSK Magnesia) Thermobestos | HSF G-8381 JZS 910167 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plants: Waukegan, Ill. Manville, N. J. |
| | Thermobestos | Rpt. No. B423-Y-396 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plants: Long Beach, Calif. |
| Class b | Thermasil | KM 910245 | Keene Corp. Industrial Insulation Div. 200 Dvoralj Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Class b | Kaylitherm-1700 | KIS 910176 | Nicolet Industries, Inc. Nicolet Avenue Florham Park, New Jersey Plants: Ambler, Pa. |
| Class b | Kayla | ERS910622 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |

1 of 3

000105

SFI-278)

| GOVERNMENT DESIGNATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION AGENCY | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| **Grade II** | | | |
| Class c | Unibestos F750 | Bew SIGCOTT, J.L.P. Research, Inc. Rept. of 18/21/44 and Pittsburgh Corning Corp. Rpt. No. PO-U-1 of 14/5/44 | Pittsburgh Corning Corp. One Gateway Center Pittsburgh 22, Pa. Plant: Tyler, Texas Port Allegany, Pa. |
| Class d | Non Carrytemp 1300 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. SCRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45213 Plant: Same address |
| Class d | Caltemp | ESS 010078 | Fibreboard Corp. Pabco Industrial Products Div. 475 Brannan St. San Francisco, Calif. 94119 Plant: Emeryville, Calif. |
| Class d | Thislite | ESS 010872 | GAF Corp. 140 West 51 St. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Class d | Thermobestos | ESN 010147 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N. J. |
| Class d | Thermobestos | Rpt. No. B420-T-846 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Class d | Thermall | SSN 010869 | Keene Corp. Industrial Insulation Div. 200 Bernard Ave. Trenton, N. J. 08607 Plant: Valley Forge, Pa. |
| Class d | Kaytherm-1700 | T27 010386 | Nicolet Industries, Inc. Market Avenue Florham Park, New Jersey Plant: Ashland, Pa. |
| Class d | Kaylo | SXS 010822 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43601 Plant: Berlin, N.J. |
| **Grade III** | | | |
| Class d Type I | Non Carrytemp 1300 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. SCRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45213 Plant: Same address |
| Type II | Non Carrytemp 1300 Cylindrical & Segmental Pipe Insulation | Philip Carey Test Rpt. SCRL-1 | Philip Carey Corp. 320 S. Wayne Ave. Cincinnati, Ohio 45213 Plant: Same address |

2 of 3

GPL-478L

| GOVERNMENT INFORMATION | MANUFACTURER'S DESIGNATION | TEST OR QUALIFICATION (drawing) | MANUFACTURER'S NAME AND ADDRESS |
|---|---|---|---|
| Grade III Class s Type I | Unisep | BMS 6109TD | Pittsburgh Corp. Pasco Industrial Products Div. 475 Brannan St. San Francisco, Calif; 94119 Plant: Emeryville, Calif. |
| Type II | Unisep | BMS 6109RL | do. |
| Type II | Pypco | BMS B-(do) | do. |
| Type 1s | Unisilite | BMS 6109T2 | CSF Corp. 140 West 31 Pl. New York, N. Y. 10020 Plant: Gloucester City, N. J. |
| Type I | Thermobestos | BMS 9T0147 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Manville, N. J. |
| Type II | Thermobestos | BMS 610147 | do. |
| Type I | Thermobestos | Rpt. No. 3420-T-096 of 12 July 1961 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Long Beach, Calif. |
| Type II | Thermobestos | Rpt. No. 3420-T-096 of 12 July 1961 | do. |
| Type II | Dus-curM | BMS 6102300 | Johns-Manville Sales Corp. 22 E. 40th St. New York, N. Y. 10016 Plant: Waukegan, Ill. |
| Type I | Thermamal | BMS 610049 | Keene Corp. Industrial Insulation Div. 200 Township Ave. Newtown, N. J. 08608 Plant: Valley Forge, Pa. |
| Type II | Thermamal | BMS 610049 | Keene Corp. Industrial Insulation Div. 200 Township Ave. Trenton, N. J. 08602 Plant: Valley Forge, Pa. |
| Type I | Raybestos-1700 | BMS 610236 | Nicolet Industries, Inc. Nicolet Avenue Flaxton Park, New Jersey Plant: Ambler, Pa. |
| Type II | Hy-Temp | BMS B-4231 | do. |
| Type I | Kayle | BMS 610222 | Owens-Corning Fiberglas Corp. Toledo, Ohio 43602 Plant: Boston, G.J. |
| Type II | Kayle | BMS 610222 | do. |
| Grade III Class 9 | Asbestos #1200 | BMS 610233, Pittsburgh Coating Corp. Rpt. No. PC-U-1 of 12/9/64 | Pittsburgh Corning Corp. One Gateway Center Pittsburgh 22, Pa. Plant: Tyler, Texas Port Allegany, Pa. |

3 of 3

☆ U.S. GOVERNMENT PRINTING OFFICE, LUG-673-643/2-16

000107



Technical and Contractual Control

Navy Department 1946

# EXHIBIT 3

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
11
12   MARA J. BALLENGER, et al.,              No. C 06-2271 CW

13             Plaintiffs,                   ORDER DENYING
                                            PLAINTIFFS' MOTION
14        v.                                TO REMAND CASE AND
                                            FOR PAYMENT OF FEES
15   AGCO CORPORATION, et al.,              AND COSTS

16             Defendants.

17   _____/

18
19
20        Plaintiffs Mara J. Ballenger, individually and on behalf of

21   the Estate of John M. Ballenger, James M. Ballenger and Charles J.

22   Ballenger move to remand this action to state court.  Defendant

23   Todd Shipyards Corporation opposes this motion and requests that,

24   if the Court is inclined to grant Plaintiffs' motion, the Court

25   certify its order for interlocutory appeal.  The motion was heard

26   on June 21, 2007.  Having considered all of the papers filed by the

27
28

United States District Court
For the Northern District of California

1   parties and oral argument, the Court denies Plaintiffs' motion to

2   remand.

3                              BACKGROUND

4         John M. Ballenger died of mesothelioma in 2005. Before his

5   death, he and his wife filed suit for asbestos personal injury and

6   loss of consortium in San Francisco County Superior Court. Todd

7   Shipyards was named as a defendant in that action. After it

8   threatened to remove the action, however, Mr. and Mrs. Ballenger

9   dismissed without prejudice the claims against Todd Shipyards.

10  Plaintiffs explain that Mr. Ballenger's health was rapidly

11  declining and they could not risk the delay that would have been

12  caused by removal; Mr. Ballenger died shortly thereafter.

13        After his death, Plaintiffs filed an amended complaint,

14  seeking damages for asbestos-caused wrongful death and loss of

15  consortium and reviving the claims against Defendant Todd

16  Shipyards. Plaintiffs bring negligence and strict liability causes

17  of action against "Asbestos Defendants," which includes Defendant

18  Todd Shipyards. The complaint alleges that Mr. Ballenger's

19  terminal mesothelioma stemmed, in part, from his occupational

20  exposure to asbestos-containing products while working on premises

21  owned or operated by Defendant Todd Shipyards.[1]

22        According to the complaint, Defendant Todd Shipyards'

23  employees and contractors negligently exposed Mr. Ballenger to

24

25        [1]Although the complaint does not identify any particular
26  vessel on which Mr. Ballenger worked, Plaintiffs state that, during
    a major overhaul at Todd Shipyards in San Pedro, California, Mr.
27  Ballenger was exposed to asbestos while serving as a Naval officer
    on the USS Tappahannock.

28                                    2

1  airborne asbestos fibers by working with asbestos-containing

2  materials in his presence and then failed to warn him of the

3  hazardous condition.  The complaint states that Defendant Todd

4  Shipyards' duty to warn Mr. Ballenger was independent of any

5  potential role the U.S. Navy might have played in specifying the

6  use of asbestos-containing materials on Navy ships and cites

7  Westbrook v. Asbestos Defendants, 2001 U.S. Dist. LEXIS 11575 (N.D.

8  Cal.).[2]

9      The complaint further states:

10     The Federal Courts lack jurisdiction over this action and
       removal is therefore improper.  There is incomplete diversity
11     of citizenship due to the presence of a California ASBESTOS
       DEFENDANT.  Every claim arising under the Constitution,
12     treaties, or laws of the United States is expressly
       disclaimed.  This includes any claim arising from an act on a
13     Federal Enclave as defined by Article I, section 8, clause 17
       of the United States Constitution.  This also includes any
14     claim arising from any act or omission of the United States,
       any agency thereof; any officer of the United States, or a
15     claim against any other person or entity that is based on an
       act that was performed under specific direction of the United
16     States, any agency thereof or any Officer of the United
       States.  No claim of admiralty or maritime law is raised.
17     Plaintiffs sue no foreign state or agency.

18  First Amended Complaint, ¶ 8.

19     On March 30, 2006, Defendant Todd Shipyard filed its notice of

20  removal, contending that removal is proper pursuant to 28 U.S.C.

21  section 1442(a)(1).  Plaintiffs filed a motion to remand.  Before

22  the Court ruled on Plaintiffs' motion, the Judicial Panel on

23  Multidistrict Litigation (MDL Panel) ordered this case transferred

24

25     [2]In Westbrook, the court remanded an action that was
    improperly removed to federal court under the federal officer
26  removal statute and awarded the plaintiffs the amount they incurred
    in attorneys' fees bringing the motion to remand.  There, unlike
27  here, the plaintiffs disclaimed, in writing, any claims arising out
    of work done on U.S. Navy vessels.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  to the Eastern District of Pennsylvania for coordinated or

2  consolidated pretrial proceedings.   The Eastern District of

3  Pennsylvania court severed all claims for punitive damages and

4  advised the MDL Panel that coordinated or consolidated pretrial

5  proceedings with respect to the remaining claims had been

6  completed.   After the MDL panel conditionally remanded all claims

7  in this case, except for the severed punitive damages claims, to

8  this Court, Plaintiffs re-noticed their motion to remand.

                              DISCUSSION

9

10  I.   Remand

11       Defendant Todd Shipyards argues that it properly removed this

12  action under the federal officer removal statute, which provides

13  that an action may be removed by "any officer of the United States

14  or any agency thereof, or person acting under him, for any act

15  under color of such office."   28 U.S.C. § 1442(a)(1).[3]

16       Generally, removal statutes are to be strictly construed; any

17  doubt as to the right to remove should resolved in favor of

18  remanding to state court.   See, e.g., Gaus v. Miles, Inc., 980 F.2d

19  564, 566 (9th Cir. 1992).   But that is not the case concerning the

20  federal officer removal statute.   See Durham v. Lockheed Martin

21  Corp., 445 F.3d 1247, 1252 (9th Cir. 2006) (noting that, because it

22

23  [3]Specifically, § 1442(a)(1) provides:
    A civil or criminal prosecution commenced in a State court
24  against any of the following persons may be removed by them to
    the district court of the United States for the district and
    division embracing the place wherein it is pending:
25  (1) Any officer of the United States or any agency thereof, or
    person acting under him, for any act under color of such
26  office or on account of any right, title or authority claimed
    under any Act of Congress for the apprehension or punishment
27  of criminals or the collection of the revenue.

28
                                 4

<div style="text-align: center; writing-mode: vertical-rl;">United States District Court<br>For the Northern District of California</div>

1  is important to the federal government to protect federal officers,

2  removal rights under section 1442 are much broader than those under

3  section 1441).  The Ninth Circuit instructs that there is a "clear

4  command from both Congress and the Supreme Court that when federal

5  officers and their agents are seeking a federal forum, we are to

6  interpret section 1442 broadly in favor of removal." <u>Id.</u> (noting

7  that the Supreme Court has "insisted that the policy favoring

8  removal 'should not be frustrated by a narrow, grudging

9  interpretation of § 1442(a)(1)'" (quoting <u>Arizona v. Manypenny</u>, 451

10 U.S. 232, 242 (1981))).

11      As the Supreme Court explained in <u>Jefferson County v. Acker</u>,

12 527 U.S. 423 (1999),

13          It is the general rule that an action may be removed from
            state court to federal court only if a federal district court
14          would have original jurisdiction over the claim in suit.  To
            remove a case as one falling within federal-question
15          jurisdiction, the federal question ordinarily must appear on
            the face of a properly pleaded complaint; an anticipated or
16          actual federal defense generally does not qualify a case for
            removal.  Suits against federal officers are exceptional in
17          this regard.  Under the federal officer removal statute, suits
            against federal officers may be removed despite the nonfederal
18          cast of the complaint.

19 527 U.S. at 430-31 (citations omitted).

20      Thus, the fact that Plaintiffs' complaint expressly disavows

21 any federal claims is not determinative.  Rather, removal is proper

22 under the federal officer removal statute if the moving party:

23 (1) demonstrates that it acted under the direction of a federal

24 officer; (2) raises a colorable federal defense to the plaintiff's

25 claims; and (3) demonstrates a causal nexus between the plaintiff's

26 claims and the defendant's acts performed under color of federal

27

28

<div style="text-align: center;">5</div>

1  office. <u>Mesa v. California</u>, 489 U.S. 121, 124-25, 134-35 (1989);

2  <u>Fung v. Abex Corp.</u>, 816 F. Supp. 569, 571-72 (N.D. Cal. 1992).⁴

3      A.  Acts under the direction of a federal officer

4      To show that it was acting under the direction of a federal

5  officer, Defendant Todd Shipyards must show that a federal officer

6  had "direct and detailed control" over it.  <u>Fung</u>, 816 F. Supp. at

7  572.  If it "establishes 'only that the relevant acts occurred

8  under the general auspices of a federal officer,' such as being a

9  participant in a regulated industry," it is not entitled to remove

10  under section 1442(a)(1).  <u>Id.</u> (quoting <u>Ryan v. Dow Chemical Co.</u>,

11  781 F. Supp. 934, 947 (E.D.N.Y. 1992)).

12      Defendant Todd Shipyards contends that it acted under the

13  direction of U.S. Navy officers and provides declarations

14  supporting this contention.  According to a retired U.S. Navy

15  Admiral, at the time that Mr. Ballenger was on the USS

16  Tappahannock, all private contractors, such as Defendant Todd

17  Shipyards, performed their work pursuant to precise requirements

18  imposed by the Navy and under the Navy's detailed supervision; "the

19  Navy dictated every aspect of the design, manufacture,

20  installation, overhaul, written documentation and warnings

21  associated with its ships, including the USS Tappahannock" and did

22  not permit deviations from its contractors.  Horne Dec., ¶ 15.

23  Among the requirements the Navy imposed on private contractors was

24  that they use asbestos-containing materials in the maintenance and

25

26      ⁴In addition, the removing party must qualify as a "person"
for purposes of 28 U.S.C. section 1441(a).  As a corporation,

27  Defendant Todd Shipyards meets this preliminary requirement.  <u>See</u>
<u>Fung</u>, 816 F. Supp. at 572.

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Plaintiffs further argue that, even accepting Admiral Horne's

2   declaration as true, his declaration only proves that the

3   government required Defendant Todd Shipyards to use asbestos

4   products, not that Defendant Todd Shipyards was under the direct

5   control of the Navy with respect to failure to warn and negligent

6   use of asbestos.  Plaintiffs, however, concede that Admiral Horne

7   concluded that the Navy directed every aspect of installation and

8   warnings associated with its ships.  They contend that neither

9   Admiral Horne's declaration, nor any other declaration Defendant

10   Todd Shipyards submitted, establishes that the Navy directed the

11   exact manner in which Defendant Todd Shipyards' workers and its

12   subcontractors performed their work with asbestos products, nor

13   that the government affirmatively prohibited contractors, including

14   Defendant Todd Shipyards, from providing warning.  This contention

15   is not persuasive.  Just as Defendant Todd Shipyards is not

16   required to produce contracts from decades past, it is not required

17   to produce such detailed declarations concerning whether the Navy

18   directed the exact manner of installation and affirmatively

19   prohibited any kind of warning in order to demonstrate that it

20   worked under the direction of federal officers; such requirement

21   would frustrate the purpose of section 1442(a)(1).  See Durham, 445

22   F.3d at 1252.  Horne's declaration is sufficient to establish that

23   a federal officer had "direct and detailed control" over Defendant

24   Todd Shipyards.

25    B.  Colorable Federal Defense

26    To meet the second prong of the Mesa test, Defendant Todd

27   Shipyards must show that it has a colorable federal defense; it

28

8

<div style="writing-mode: vertical">United States District Court<br>For the Northern District of California</div>

1  need not prove that its defense will be meritorious.  Mesa, 489

2  U.S. at 128; Fung, 816 F. Supp. at 573.  As the Supreme Court

3  explained in Willingham v. Morgan, 395 U.S. 402, 407 (1969), "The

4  officer need not win his case before he can have it removed."

5      Under Boyle v. United Technologies, Corp., 487 U.S. 500

6  (1988), liability for design defects in military equipments cannot

7  be imposed on contracts, "pursuant to state law, when (1) the

8  United States approved reasonably precise specifications; (2) the

9  equipment conformed to those specifications; and (3) the supplier

10 warned the United States about the dangers in the use of the

11 equipment that were known to the supplier but not to the United

12 States."  487 U.S. at 512.  In their motion, Plaintiffs argue that

13 Defendant Todd Shipyards fails to produce any evidence necessary to

14 show that it is entitled to the government contractor defense.  In

15 their reply, however, Plaintiffs do not argue that Defendant Todd

16 Shipyards does not have a colorable government contractor defense;

17 rather, they argue that the Court need not address this issue

18 because Defendant Todd Shipyards fails to satisfy the first and

19 third prongs of the Mesa test.   The Court, however, finds that

20 Defendant Todd Shipyards satisfies the first prong, as discussed

21 above, and the third prong, as discussed below.  Further, the Court

22 finds that Defendant Todd Shipyards has a colorable federal

23 defense.

24     C.  Causal Nexus

25     The final prong requires that a defendant demonstrate a causal

26 nexus between the claims against it and the acts it performed under

27

28                            9

1  color of federal office.  See Overly v. Raybestos-Manhattan, 1996

2  WL 532150, *4 (N.D. Cal.) (noting that the final requirement under

3  the Mesa test is that there be a causal connection "between the

4  rules imposed by the United States on the defendant contractor by

5  the federal government and the liability asserted by plaintiff").

6  Defendant Todd Shipyards argues that this prong is satisfied

7  because, as discussed above, it has produced evidence attesting to

8  the regulations imposed by the U.S. Navy on the repair of its

9  vessels, including the USS Tappahannock.  These regulations

10 required that Defendant Todd Shipyards use asbestos products.  The

11 Navy directed, inspected and supervised work on its vessels to

12 ensure that contractors, such as Defendant Todd Shipyards, adhered

13 to its requirements.

14      Plaintiff responds that there is no causal nexus, arguing that

15 Defendant Todd Shipyards only establishes that federal officers

16 directed it to use asbestos and that its claims are not limited to

17 mere use of asbestos: the same argument the Court rejected above.

18 The Court finds that Defendant Todd Shipyards also satisfies the

19 causal nexus requirement.

<div align="center">CONCLUSION</div>

21      For the foregoing reasons, the Court DENIES Plaintiffs' motion

22 to remand this case and their request for attorneys' fees and costs

23 incurred in bringing their motion to remand.  Removal was proper

24 under the federal officer removal statute.  Defendant Todd

25 Shipyards' request to certify this motion for interlocutory appeal

26

27

28

<div align="center">10</div>

United States District Court
For the Northern District of California

1    is denied as moot.[5]

2        IT IS SO ORDERED.

3        6/22/07

4    Dated:  _____

CLAUDIA WILKEN
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    [5]Both parties submitted objections to other parties' evidence.
To the extent that the Court relied upon evidence to which there is
26    an objection, the parties' objections are overruled.  To the extent
that the Court did not rely on such evidence, the parties'
27    objections are overruled as moot.  The Court has not relied on any
inadmissible evidence in deciding this motion.

28

11

United States District Court
For the Northern District of California

# EXHIBIT 4

SEND

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES -- GENERAL

Case No.    **CV 07-8338VBF(RCx)**                    Dated: **February 8, 2008**

Title:    Donald Nelson, et al. *-v-* Alfa Laval, Inc., et al.

---

PRESENT:    HONORABLE VALERIE BAKER FAIRBANK, U.S. DISTRICT JUDGE

        Rita Sanchez                        None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

        None Present                        None Present

**PROCEEDINGS (IN CHAMBERS):**        **RULING RE: PLAINTIFF'S MOTION TO REMAND**
                                      **[FLD 1/7/08]**

        Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument.  The hearing calendared for February 11, 2008 at 1:30 p.m. is hereby vacated and the matter taken off calendar.

        After review of all papers filed, the Motion to Remand is DENIED.  First, although most removal statutes are narrowly construed, the Federal Officer Removal Statute is an outlier.  Plaintiff cannot plead around the "government contractor" defense.  Second, Defendant Foster Wheeler has presented sufficient evidence to set forth a colorable government contractor defense.  Although the evidence is not overwhelming, it is sufficient to meet the low bar of a "colorable" defense at this stage.

MINUTES FORM 90                        Initials of Deputy Clerk __rs__
CIVIL - GEN

-1-

## 1.    Background

### a.    Filing History

Plaintiff Donald Nelson and his wife, Hilaria Nelson, filed this action in California Superior Court in November, 2007 against several manufacturers of asbestos-containing products.   Plaintiffs allege that Donald Nelson contracted malignant pleural mesothelioma, a type of cancer, due to exposure to asbestos while serving as a fireman/boiler tender in the U.S. Navy aboard a destroyer from 1959 to 1963.  Defendant Foster Wheeler was served on November 28, 2007 and removed this action to federal court on December 27, 2007.

Foster Wheeler asserts that Nelson's injuries stem from service on a Navy destroyer that was commissioned in 1946.  Foster Wheeler designed and built boilers and auxiliary equipment for the U.S. Navy.  It is possible that Foster Wheeler boilers and equipment were on the ship on which Mr. Nelson served.

Plaintiffs filed this present Motion to Remand to State Court on January 7, 2008. Defendant Foster Wheeler filed an Opposition and supporting declaration on January 18, 2008.  Plaintiffs filed a Reply brief in support of their Motion to Remand on January 25, 2008.  Defendant Leslie Controls, Inc. filed a joinder to Foster Wheeler's Notice of Removal and Opposition to Motion to Remand on January 25, 2008.  Plaintiffs filed a Reply to Leslie Control's Joinder on January 29, 2008.

### b.    Federal Officer Removal Statute and Federal Contractor Defense

The basis for Foster Wheeler's removal is 28 U.S.C. § 1442(a)(1), which authorizes removal in a civil case "commenced in a State court against … [t]he United States or any agency thereof or any officer (or person acting under that officer) of the United States or of any agency thereof…"  Removal is proper under the Federal Officer Removal Statue where the moving party: (1) demonstrates that it acted under the direction of a federal officer; (2) demonstrates a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office; and (3) raises a colorable federal defense to the

plaintiff's claims.  <u>Mesa v. California</u>, 489 U.S. 121, 124-45, 134-35, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989).

As to the first and second factors, Foster Wheeler argues that it was acting under the direction of the United States Navy and its officers.  Acting under this direction, Foster Wheeler submits that it was not allowed to vary from design specifications approved by the Navy nor affix warnings to its boilers.  To prove that it followed with the directions of the Navy in design and manufacture of its products, Defendant Foster Wheeler filed several declarations – J. Thomas Schroppe, Ben Lehman and Lawrence Stillwell Betts – with their Notice of Removal.

To meet the third prong of removal under the Federal Officer Removal Statute, Foster Wheeler must submit a "colorable" federal defense.  Foster Wheeler submits that it intends to offer a "government contractor" defense, under the case <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).  Under <u>Boyle</u>, to establish a federal contractor defense, the defendant must prove (1) "The United States approved reasonably precise specifications" for the military equipment supplied by the contractor; (2) "the equipment conformed to those specifications;" and (3) "the [military contractor] warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States."

According to Foster Wheeler, the government contractor defense is available in a failure to warn case "where there is evidence that the government was involved in the decision to give, or not to give, a warning."  <u>Kerstetter v. Pacific Scientific Co.</u>, 210 F.3d 431, 438 (5th Cir.), <u>cert. denied</u> 531 U.S. 919 (2000).

## 2.  <u>Summary of Arguments</u>

Plaintiffs' Motion argues that the Complaint expressly disclaims all federal claims. Instead, according to the Plaintiffs, they seek only to assert state-law duty to warn claims, and therefore, removal was not proper.  Plaintiffs also assert that the government contractor defense is untenable because Foster Wheeler has presented insufficient evidence

MINUTES FORM 90                                    Initials of Deputy Clerk ___rs___
CIVIL - GEN

to support the contention that the Navy specifically directed the design and production of boilers and auxiliary equipment.

**3.**    **Burden on Removal**

     **a.**    The Well-Pleaded Complaint Rule and Plaintiff's Disclaimer

Plaintiffs argue that removal was improper because they disclaimed all federal remedies. Plaintiffs' Complaint, paragraph 4, states:

> "Plaintiffs hereby disclaim any cause of action or recovery for any injuries caused by any exposure to asbestos dust that occurred in a federal enclave, which expressly excludes U.S. Navy vessels. Plaintiffs also disclaim any cause of action or recovery for any injuries resulting from exposure to asbestos dust caused by any acts or omissions of a party Defendant committed at the direction of an officer of the United States Government."

Plaintiffs argue that such disclaimers are generally given effect as an extension of the well-pleaded complaint rule. See, e.g., Jefferson County v. Acker, 527 U.S. 423, 430-31, 119 S.Ct. 2069 (1999).

Despite this rule, suits against federal officers "may be removed despite the nonfederal cast of the complaint." Jefferson County, 527 U.S. at 430. "The statute providing for removal of any civil action against the United States or any agency or officer thereof creates an exception to the well-pleaded complaint rule; even if a plaintiff's complaint does not, on its own, raise a federal question, federal jurisdiction is proper where a defendant establishes the statutory requirements." Machnik v. Buffalo Pumps, Inc., 506 F.Supp.2d 99 (D. Conn. 2007).

     **b.**    Application of 28 U.S.C. § 1442(a)(1)

Removal statutes are, as a general rule, narrowly interpreted. See Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992). ("Removal statutes are to be strictly construed, and any doubts as to the right of removal be resolved in favor or remanding to state court.") The

MINUTES FORM 90
CIVIL - GEN

Initials of Deputy Clerk    rs

Federal Officer Removal Statute, however, is subject to a more liberal interpretation than the general federal removal statue.  The Supreme Court has "held that the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal should not be frustrated by a narrow or grudging interpretation of 28 U.S.C. § 1142(a)(1)."  Arizona v. Manypenny, 451 U.S. 282, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981) (quoting Willingham v. Morgan, 395 U.S. 402, 407, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969)).

The Ninth Circuit has stated: "[W]e do not interpret our jurisdiction under section 1442 so strictly…the Supreme Court has mandated a generous interpretation of the federal officer removal statute."  Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1252 (9th Cir. 2006).  The Ninth Circuit noted, after describing the history of the Federal Officer Removal Statute: "We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal."  Id. at 1252 (citing Bradford v. Harding, 284 F.2d 307, 310 (2d Cir. 1960)).

Plaintiff submits that, despite this authority, the removal statute should be narrowly construed, and that Foster Wheeler, as a private party, "bear[s] a special burden in establishing the official nature of their activities."  See Reply, p.2, citing Williams v. Gen. Elec. Co., 418 F.Supp.2d 610 (M.D. Penn. 2005), quoting Freiberg v. Swinerton & Walberg Property Svcs., Inc., 245 F.Supp. 2d 1144, 1150 (D.Colo. 2002).  Even accepting that Foster Wheeler bears a "special burden" as a private party asserting a government contractor defense, for purposes of removal, Foster Wheeler need only advance a "colorable" government contractor defense for removal to be appropriate.

## 4.    Requirements for Federal Jurisdiction under 28 U.S.C. § 1442(a)(1)

As noted above, removal under 28 U.S.C. § 1442(a)(1) is appropriate where a Defendant:  (1) demonstrates that it acted under the direction of a federal officer; (2) demonstrates a causal nexus between the plaintiff's claims and the defendant's acts performed under color of federal office; and (3) raises a colorable federal defense to the plaintiff's claims.  Mesa v. California, 489 U.S. at 124-25, 134-35 (1989).

MINUTES FORM 90                                    Initials of Deputy Clerk ___rs__
CIVIL - GEN

    a.    <u>Whether Foster Wheeler Acted Pursuant to a Federal Officer's Directions</u>

Plaintiffs argue that "Foster Wheeler … must provide evidence that the Navy – in its contract specifications – prohibited Foster Wheeler from issuing warning about the hazards of asbestos. Mot. at 7.

While the affidavits may be somewhat generic, they are sufficient to set forth a "colorable" claim of a government contractor defense.[1] The declaration of J. Thomas Schroppe establishes that Foster Wheeler was required to follow the directions of the Navy. Mr. Schroppe was an employee and past president of Foster Wheeler. His experience gives him sufficient personal knowledge to testify to the amount of control exercised by the Navy over its contractors. He states that Foster Wheeler would not have been permitted to affix a warning label to a piece of equipment manufactured for the Navy.

The declaration of Admiral Ben J. Lehman also establishes that the level of control that the Navy exercised over its contractors. Admiral Lehman acted in various capacities for the Navy from 1942 through 1954, including acting as a ship superintendent. He also states that Foster Wheeler would not be permitted to affix a warning to equipment.

Further, Plaintiffs argue "Foster Wheeler offers no actual specification or contracts wherein the Navy ever precluded it from issuing warning about asbestos. Foster Wheeler attempts to rely on the generic and previously-prepared declaration of J. Thomas Schroppe and Admiral Ben J. Lehman." Mot. at 8.

---

[1] In addition to the Affidavits submitted by Foster Wheeler, Defendant Leslie Controls submits a declaration with its Joinder. This declaration is by Mr. Matt Wrobel, a corporate representative of Leslie Controls, is more general than that submitted by Foster Wheeler and covers a later time frame. In addition, the Court notes that this Joinder was filed late, on January 25, 2008, after the time for Reply. For this reason, the Court does not base its decision on the evidence and arguments submitted with the late-filed Joinder.

MINUTES FORM 90                             Initials of Deputy Clerk   <u>rs</u>
CIVIL - GEN

With their Opposition to the Motion to Remand, however, Foster Wheeler submits a purchase order dated October 18, 1942, for boilers. This purchase order contains a 36 page appendix detailing the specifications for each piece of equipment. This demonstrates that all of the products produced by Foster Wheeler for the Navy were subject to strict controls and design specifications.

      b.    <u>Whether a Causal Nexus Exists Between the Defendant's Actions Under Color of Federal Office and Plaintiff's Claims</u>

Similar issues regarding removal by federal contractors have arisen frequently. The more persuasive and analogous precedent support denying the motion to remand. In <u>Ballenger v. Agco Corp.</u>, 2007 WL 1813821 (N.D. Cal. 2007), the plaintiff alleged that he was injured from exposure to asbestos while working on a shipyard that manufactured ships for the Navy.[2] The court determined, on evidence similar to that submitted here, that removal was proper. The court noted, in response to the plaintiff's evidentiary objections that defendants "[are] not required to produce contracts from decades past in order to demonstrate that it worked under the direction of federal officers; to require such documentation would frustrate the purpose of section 1442(a)(1)." <u>Id.</u> at *3 (citing <u>Durham</u>, 445 F.3d at 1252).

In <u>Machnik v. Buffalo Pumps, Inc.</u>, 506 F.Supp.2d 99 (D. Conn. 2007), Defendant General Electric (GE) removed and the Plaintiff sought to remand. The court considered whether removal was proper, where GE claimed to provide goods and services to the U.S. Navy. The court stated the plaintiff's claims "against GE are based only upon his exposure to asbestos-containing products supplies by GE to the U.S. Navy. Because of this, once GE meets the threshold showing to assert a federal contractor defense, even artful pleading around any federal claims cannot defeat federal subject matter jurisdiction." <u>Id.</u> at 104.

Plaintiff relies, in part, on <u>In re Hawaii Federal Asbestos Cases</u>, 960 F.2d 806, 813 (2d Cir. 1992). As Defendant Foster Wheeler submits, however, this case is distinguishable. In the <u>Hawaii Federal Asbestos Cases</u>, the Ninth Circuit found that the government contractor

---

[2] The case is misidentified in the Defendant's papers but attached as exhibit B to their declaration.

MINUTES FORM 90                              Initials of Deputy Clerk   <u>rs</u>
CIVIL - GEN

defense was unavailable because the asbestos-containing goods at issue were the same as those commercially available. That is, the goods at issue there were not specially produced for the government and according to government specifications. Here, however, the boilers were built specially for combat vessels and according to detailed government specifications.

      c.    <u>Colorable Federal Defense</u>

    To support removal, Foster Wheeler needs to set forth a "colorable" federal defense. <u>Mesa v. California</u>, 489 U.S. 121, 133-34 (1989). As noted above, Foster Wheeler seeks to assert a federal contractor defense, which requires proving three elements. (1) "The United States approved reasonably precise specifications" for the military equipment supplied by the contractor; (2) "the equipment conformed to those specifications;" and (3) "the [military contractor] warned the United States about the dangers in the use of the equipment that were known to the [contractor] but not to the United States."

    First, as noted above, Defendant must show that it acted under the direction of a federal officer. "Whether a defendant is 'acting under' the direction of a federal officer depends on the detail and specificity of the federal direction of the defendant's activities and whether the government exercises control over the defendants." <u>Watson v. Phillip Morris Cos.</u>, 420 F.3d 852, 856-67 (8th Cir. 2005). As noted above, it appears there was fairly specific direction and control over the equipment supplied.

    Second, the evidence of conformity with specifications is weak. Nevertheless, the evidence is sufficient to set forth a "colorable" defense.

    Third, as set forth in the declaration of Dr. Betts, it is unlikely that Foster Wheeler held superior knowledge regarding asbestos and failed to warn the Navy. The declaration of Dr. Betts details the level of knowledge the Navy had regarding the effects of exposure to asbestos. Dr. Betts states that the Navy has had state-of-the-art knowledge regarding asbestos since the 1920s and exercised control over all warnings on equipment, such as boilers. Mot. at 12.

MINUTES FORM 90                                    Initials of Deputy Clerk __rs__
CIVIL - GEN

# EXHIBIT 5

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  ALBERT WRIGHT JR.,                         No. C07-05403 MJJ

12                   Plaintiff,                **ORDER DENYING MOTION TO**
                                               **REMAND**
13      v.

14  A.W. CHESTERTON COMPANY INC,

15                   Defendant.
                                        /
16

17                              **INTRODUCTION**

18         Before the Court is Plaintiffs Albert Wright, Jr. ("Mr. Wright") and Marva Wright's

19  (collectively, "Plaintiffs") Motion to Remand. (Docket No. 23.)  Defendants Foster Wheeler

20  ("Foster Wheeler") and Leslie Controls ("Leslie Controls") (collectively, "Defendants") oppose the

21  Motion.[1]  For the following reasons, the Court **DENIES** the Motion.

22                            **FACTUAL BACKGROUND**

23         This is a personal injury action arising out of injuries allegedly sustained by Mr. Wright due

24

25         [1] Plaintiff objects to Leslie Controls' Joinder in Foster Wheeler's Notice of Removal and Leslie Controls' Joinder
    in Foster Wheeler's Opposition to this Motion.  Whether or not Leslie Controls may join the Notice of Removal is not,
26  however, dispositive of this Motion because any defendant can unilaterally remove a case under § 1442.  *See Durham v.*
    *Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (explaining that a federal officer or agency defendant can unilaterally remove
27  a case under § 1442).  Therefore, for purposes of this Motion, the Court need not determine whether Leslie Controls' may
    join in Foster Wheeler's Notice of Removal.  However, once the case is removed by Foster Wheeler, the Court perceives
28  no reason why Leslie Controls may not join in Foster Wheeler's Opposition to Plaintiff's Motion to Remand.  In addition,
    Leslie Controls filed its joinder in the opposition not less than 21 days before the hearing date with both the Court and
    Plaintiffs. (*See* Plf.'s Objection, Docket No. 44 at 2.)  The Court therefore perceives no prejudice from Leslie Control's
    failure to efile. *See* Civ. L.R. 7-3(a).

United States District Court
For the Northern District of California

1    to exposure to Defendants' asbestos and asbestos-containing products. (*See* Keller Decl., Exh. A

2    ("Complaint") ¶¶ 10-15.)  Plaintiffs allege that Mr. Wright contracted lung cancer as a result of his

3    exposure to these products during his employment as a machinist and flange turner, among other

4    places, for the Navy. (*Id.* ¶¶ 11, 36-37, Exh. A.)  Mr. Wright worked aboard twenty-six or more

5    Navy ships and vessels in his career.[2] (*See id.* at Exh. A.)

6            Plaintiffs filed this asbestos action on September 13, 2007 in San Francisco County Superior

7    Court against Defendant Foster Wheeler, Leslie Controls and dozens of other defendants. (*See*

8    Keller Decl., Exh. A ("Complaint").)  Plaintiffs brought claims of negligence, strict liability, false

9    representation, intentional tort, premises owner/contractor liability and loss of consortium. (*See*

10    Complaint at 1.)  Plaintiffs argue, in this Motion, that Plaintiffs' claims against Foster Wheeler are

11    based only on its failure to warn about the dangers of asbestos that Foster Wheeler incorporated into

12    the design and manufacture of its boilers. (Plfs.' Mem. of P. & A. at 14.)  Indeed, in the Complaint,

13    Plaintiffs "disclaim any cause of action or recovery for any injuries and damages resulting from

14    exposure to asbestos caused by the acts or omissions of defendants committed at the specific

15    direction of an officer of the United States Government acting within his official capacity." (*See*

16    Complaint ¶ 9a.)  Foster Wheeler filed a Notice of Removal on October 23, 2007. (*See* Notice of

17    Removal, Docket No. 1.)  Plaintiffs now seek an order remanding this case to state court.

18                                    **LEGAL STANDARD**

19            Pursuant to 28 U.S.C. § 1441(a), a defendant in a civil action may remove a case from state

20    court to federal district court if the district court has subject matter jurisdiction over the case.  The

21    Court strictly construes the removal statute against removal and Defendants have the burden of

22    establishing that removal jurisdiction is proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566-67 (9th

23    Cir. 1992).

24            Removal pursuant to 28 U.S.C. § 1442, however, is different.  Pursuant to 28 U.S.C. §

25    1442(a)(1), a civil action may be removed by "[a]ny officer of the United States or any agency

26    _____

27    [2] Mr. Wright worked aboard various Navy vessels including, but not limited to, the USS Midway, USS Enterprise, USS Kitty Hawk, USS Coral Sea, USS Oriskany, USS Constellation, USS Mount Hood, USS John F Kennedy, USS Hancock, USS Ticonderoga, USS Providence, USS Mount Baker, USS Mauna Kea, USS Pigeon, USS Pyro, USS Guitarro,

28    USS Drum, USS Pintado USS Hawkbill, USS Permit, USS Swordfish, USS Halibut, USS Grayback, USS Brinkley Bass, USS Trigger, and USS Wahoo.

United States District Court
For the Northern District of California

1  thereof, or person acting under him, for any act under color of such office." 28 U.S.C. § 1442(a)(1).

2  To satisfy this provision a party must "(1) demonstrate that it acted under the direction of a federal

3  officer; (2) raise a colorable federal defense to plaintiff's claims; and (3) demonstrate a causal nexus

4  between plaintiff's claims and the acts defendants performed under color of federal office." *Fung v.*

5  *Abex Corp.*, 816 F.Supp. 569, 517 (N.D.Cal. 1992) (citing *Mesa v. California*, 489 U.S. 121, 124-

6  125, 134-135 (1989)).[3]

7         Unlike removal under § 1441(a), the presumption under § 1442 is in favor of removal. *See*

8  *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252-53 (9th Cir. 2006). In *Durham*, after a

9  review of the relevant case law, the Ninth Circuit stated that "when federal officers and their agents

10  are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Id.* at

11  1252. The Court further explained that "[b]ecause it's so important to the federal government to

12  protect federal officers, removal rights under section 1442 are much broader than those under

13  section 1441." *Id.* at 1253 (noting that the breadth of the removal rights are exemplified by, inter

14  alia, the fact that under § 1442 a federal officer can remove a case even if the plaintiff could not have

15  filed the case in federal court to begin with, that removal under § 1442 is not subject to the well-

16  pleaded complaint rule and that a federal officer or agency can unilaterally remove a case under

17  section 1442).[4]

## ANALYSIS

19         Plaintiffs argue that Defendants fail to establish that Foster Wheeler acted under the direction

20  of a federal officer, raised a colorable federal defense, or established a causal nexus between its

21  alleged action under the control of a federal officer and Plaintiffs' claims. Plaintiffs also raise

22  evidentiary objections to Defendants' evidence.

---

[3] The removing party must also qualify as a federal officer or person acting under the same. As a corporation, Foster Wheeler meets this requirement. *See Fung*, 816 F.Supp. at 572. Additionally, the parties do not contend otherwise.

[4] Plaintiffs correctly argue that the Ninth Circuit, in *Durham*, was confronted with the question of whether the removal petition was timely, so the court did not reach the merits of the defendant's removal petition. Plaintiff understates, however, the breadth of the holding in *Durham*. While *Durham* needed only to determine the timeliness question, the Court analyzed the history of § 1442. In so doing, the Circuit's determination that there should be a presumption in *favor* of removal was not limited to the mere question of timeliness. In addition, the Circuit makes the presumption determination in order to come to its final holding. Thus, the language regarding the breadth and presumption in favor of removal was not dicta, but essential to the holding and thus binding. A recent decision from this court interpreted it as such and accordingly denied a motion to remand. *See Ballenger v. AGCO*, No. C 06-2271, 2007 WL 1813821 (N.D. Cal. June 22, 2007).

3

United States District Court
For the Northern District of California

1    Defendants, on the other hand, argue that they have submitted sufficient evidence on each of

2  the required elements for removal under § 1442 in both their Notice of Removal and the exhibits

3  attached to their Opposition to this Motion. The Court turns first to the evidentiary challenges, then

4  to the merits.

5  **I.    Evidentiary Issues**

6    In the instant case, Defendants submit four declarations. Plaintiff raises evidentiary

7  objections to all four. The general contours of these objections are outlined in this section. Below,

8  in the discussion on the merits, if the outcome relies on evidence that is specifically challenged, it

9  shall be so noted and the objection resolved.

10    The first two declarations, attached to Defendant's Notice of Removal, are the declarations

11  of J. Thomas Schroppe, a retired Foster Wheeler executive, and Ben J. Lehman, a retired Rear

12  Admiral of the United States Navy. These declarations are offered for the purpose of demonstrating

13  that Foster Wheeler was subject to government specifications and oversight in all aspects of the

14  design of its boilers, including the relevant warnings attached thereto. (*See* Affidavit of J. Thomas

15  Schroppe, Notice of Removal, Exhibit B and Affidavit of Ben J. Lehman, Notice of Removal,

16  Exhibit C). Plaintiffs object to the admissibility of these affidavits for four reasons. (*See* Plfs.'

17  Evid. Obj.) First, Plaintiffs argue that under Federal Rule of Evidence ("FRE") 402, the challenged

18  evidence is not relevant. Next, under FRE 602, Plaintiffs contend that the witnesses do not have

19  personal knowledge of the matters asserted. Third, some of the evidence is purportedly inadmissible

20  hearsay under FRE 802. Finally, Plaintiffs argue that these declarations violate the best evidence

21  rule, under FRE 1002-1004.[5]

22    As a general matter, none of these objections are meritorious. First, the declarations are

23  relevant to this Motion because they are related to the Navy's level of control over Foster Wheeler's

24  production activities. (*See* Notice of Removal, Exhs. B, C.) Mr. Wright alleges that his injuries

25  were caused by his work on at least twenty-six Navy ships, not just one or even a small handful.

26  While Defendants only cite one ship by name in their Notice of Removal, they note that the

27

28    [5] While Plaintiffs refer to the "secondary evidence rule" and cite FRE 1003, the Court presumes, given the description of the objection, that the objection is based on FRE 1002.

4

United States District Court
For the Northern District of California

1   allegations are related to "exposure while working on, among other ships, the USS Constellation."

2   (*See* Notice of Removal at 2.)  Thus, evidence regarding general navy practices, as it relates to the

3   Navy's contracts with Foster Wheeler, is both relevant and appropriate.  Insofar as Plaintiff argues

4   that the testimony is not relevant because these declarations are dated prior to the inception of this

5   action in state court, this argument is unavailing.  The fact that the declaration pre-dates the

6   inception of the suit does not undermine the relevance of the practices testified to, all of which

7   occurred prior to the date the declaration was signed.

8        Next, both Schroppe and Lehman testify to their personal knowledge of the facts contained in

9   the declaration.  Schroppe states that he is personally familiar with the degree of supervision and

10  control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for

11  boilers and auxiliary equipment because he was personally involved in such contracts at all the

12  various stages of contracting.  (*See id.*, Exh. B at 2.)  Lehman testifies that his years of experience

13  with the Navy have caused him to be thoroughly familiar with U.S. Navy specifications and the

14  means by which the U.S. Navy controlled its contracts and inspection procedures.  (*See id.*, Exh. C

15  at 9.)  Thus, Schroppe and Lehman's testimony regarding the Navy's contracting and specifications

16  related to Foster Wheeler boilers is based on personal knowledge.  Third, insofar as specific

17  statements are inadmissible hearsay, this will be taken up as is relevant, below.  However, as a

18  general matter, the majority of the challenged statements are based on personal knowledge, not an

19  out of court statement, and are not inadmissible hearsay.  Finally, these declarations do not violate

20  the Best Evidence Rule.  Under FRE 1002, "to prove the content of a writing, recording, or

21  photograph, the original writing, recording, or photograph is required."  Here, Schroppe and

22  Lehman, in their declarations, do not attempt to prove the content of a writing, recording or

23  photograph.  While the declarations cite various specifications that are also written, such as the

24  Military Specifications ("Mil Specs"), they rely on their independent knowledge of the contents and

25  therefore need not submit the document/s themselves.

26       The third declaration, by Thomas J. Moses, counsel for Foster Wheeler, includes a copy of

27  Plaintiffs' Preliminary Asbestos Litigation Statement, a copy of a Government Purchase Order, and

28  a copy of a District Court case.  (Moses Decl., Exhs. A-C.)  Plaintiff objects to the Purchase Order,

5

1  arguing that it never references the USS Constellation and Defendant's attorney never establishes a

2  foundation for its authenticity or how he is qualified to submit or interpret it. (Plfs.' Reply at 9.)

3  The Court agrees that the Government Purchase Order lacks some foundation and specificity.

4  However, the Court need not determine the admissibility of this document as the Court need not rely

5  on it to resolve this Motion.

6        Finally, the fourth declaration, by Lawrence Stilwell Betts ("Betts"), includes forty-five

7  exhibits. Plaintiffs generally object to the entire declaration on the same grounds that they object to

8  the Schroppe and Lehman declarations. As above, as a general matter, these objections are not

9  meritorious. However, insofar as the Court's decision relies on specific portions of the Betts

10  declarations, the objections thereto are considered below.

11        Plaintiffs also argue that the Court should not consider the Betts declaration because it was

12  untimely. The Court, however, finds this argument unavailing. First, Plaintiffs contend that a

13  removal notice cannot be amended or supplemented after the time for removal has expired. (*See*

14  Plfs.' Reply at 5.) While this may be the case, Defendants do not seek to amend their removal

15  notice. In addition, the issues raised in the Betts declaration, and attached exhibits, were generally

16  raised in Defendants' Notice of Removal. (*See* Notice of Removal, Exh. C at 14-15.) Thus, the

17  untimeliness argument is unavailing. In addition, the Betts declaration was filed with the Court on

18  December 17, 2007, more than the requisite time in advance of the January 29, 2008 hearing in this

19  matter. While Defendants failed to efile the exhibits, the Court received copies on December 17,

20  2007 and Plaintiffs received copies on December 18, 2007, also more than 21 days before the

21  hearing in this matter. Thus, while Defendants may have committed a procedural error in filing this

22  declaration, the Court perceives no prejudice from the Court's consideration of the Betts declaration

23  in resolving this matter.

24  **II.     The Merits**

25        **a.      The First and Third *Mesa* Prongs: Foster Wheeler acted under the direction of a**

26               **federal officer and Foster Wheeler demonstrated a causal nexus.**

27        Under *Mesa*, Defendants must establish that Foster Wheeler acted under the direction of a

28  federal officer. 489 U.S. at 121, 134-45. In addition, Defendants must establish that there is a

6

1    causal nexus between Plaintiff's claims and Foster Wheeler's actions under the control of a federal

2    officer. *See id.* Defendants contend that they have established both of these prongs. The Court

3    agrees.

4        To show that Defendants acted under the direction of a federal officer, Foster Wheeler cannot

5    simply show that the "relevant acts occurred under the general auspices of a federal officer, such as

6    being a participant in a regulated industry." *Fung*, 816 F. Supp. at 572 (quotations omitted).

7    Instead, "[a] majority of courts have held that the federal official must have 'direct and detailed

8    control' over the defendant." *Id.* (quoting *Ryan v. Dow Chemical Co.*, 781 F.Supp. 934, 947

9    (E.D.N.Y. 1992).

10        Relying on *Good v. Armstrong World Industries*, 914 F.Supp. 1125 (E.D.Pa. 1996), Plaintiffs

11    contend that Foster Wheeler must also cite a specific federal officer who designed, manufactured or

12    even directed the design and manufacture of the boilers present in the Navy vessels and installations

13    identified in Plaintiffs' Complaint. (Plfs.' Mem. of P. & A. at 8-9.) Plaintiffs, however, provide no

14    authority establishing that this is a requirement in the Ninth Circuit. In fact, such a finding would be

15    in potential conflict with the removal standard enunciated in *Durham*. Thus, Plaintiffs have not

16    shown that Defendants, in this circuit, are required to cite a specific federal officer, as long as they

17    show that they acted under the requisite direct and detailed control of a federal official. *See Fung*,

18    816 F. Supp. at 572.

19        Here, Defendants have provided sufficient evidence supporting a finding that the Navy had

20    direct and detailed control over their ability to place asbestos warnings on their boilers provided to

21    the Navy. Under contracts between Foster Wheeler and the Navy for boilers and auxiliary

22    equipment, the Navy was responsible for all design aspects and approved the equipment at multiple

23    steps along the way. (*See* Notice of Removal, Exh. B. ("Schroppe Decl") ¶¶ 2, 5, 8, 9, 12, 14, 19.)

24    In addition, the Navy exercised significant direction and control over the contents of all written

25    documentation to be delivered with the naval boilers. (*Id.* ¶ 21.) Under the Navy's precise

26    specifications, Foster Wheeler was not permitted to affix any type of warning or caution statement to

27    a piece of equipment intended for installation onto a Navy vessel, beyond those required by the

28

United States District Court
For the Northern District of California

7

**United States District Court**
For the Northern District of California

1    Navy. (*Id.* ¶ 22.)[6]

2        Plaintiffs offer no contradictory evidence. Instead, Plaintiffs argue that there is no evidence

3    that the asbestos-containing components were anything other than standard stock equipment. (Plfs.'

4    Mem. of P. & A. at 10.) However, the evidence presented by Defendants establishes that the boilers

5    that Foster Wheeler designed and manufactured for the Navy were subject to specific design

6    requirements and control that resulted in equipment that was specific to the needs of the Navy and

7    not standard stock equipment. In addition, Plaintiffs argue that Defendants' evidence is insufficient

8    and contradictory. However, perceiving no real contradictions in the evidence, and given the

9    presumption in favor of removal under *Durham,* this evidence is sufficient to establish the Navy's

10   direct and detailed control over Defendants' design of the boilers and the warnings attached thereto.

11       Next, Plaintiffs argue that there is no causal nexus because there is no proof that a specific

12   federal officer directed Foster Wheeler about warnings specifically. However, as discussed above,

13   there is no requirement that Defendants cite a specific federal officer by name, as long as the

14   requisite direction, control and causal nexus is established. In addition, Defendants offer evidence

15   that the Navy would not permit Foster Wheeler to affix any type of warning or caution statement to a

16   piece of equipment intended for installation onto a navy vessel, beyond those required by the Navy.

17   (*See* Schroppe Decl. ¶ 22; Lehman Decl. ¶ 14.) As Lehman testified, "[t]o do so would have

18   interfered with the U.S. Navy's mission and control of its ships and personnel." (Lehman Decl. ¶

19   14.) Thus, Defendants have established a causal nexus between Plaintiff's claims and Foster

20   Wheeler's actions under the control of a federal officer.[7]

21       **b.    Second *Mesa* Prong: Foster Wheeler raises a colorable federal defense to**

22             **Plaintiffs' claims.**

23       Foster Wheeler urges the Court to determine its right to remove under 28 U.S.C. 1442(a)(1)

24   in light of the government contractor's defense set forth in *Boyle v. United Technologies Corp.,* 487

25

26   [6] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Schroppe declaration are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

27

28   [7] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary. The objections to these sections of the Schroppe and Lehman declarations are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

1  U.S. 500 (1988). As discussed more fully below, the Court finds that there is sufficient evidence in

2  the record to raise a colorable government contractor defense.

3       In *Boyle*, the Supreme Court found that liability arising from state law, here the duty to warn,

4  may not be imposed in instances where "(1) the United States approved reasonably precise

5  specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the

6  United States about the dangers in the use of the equipment that were known to the supplier but not

7  to the United States." *Id.* at 512. As noted above, Plaintiffs waive all claims against Foster Wheeler

8  save for those arising from a failure to warn. (*See* Complaint ¶ 9a.) The Ninth Circuit clarified the

9  contractor defense as it applies to failure to warn claims in *Butler v. Ingalls Shipbuilding, Inc.*, 89

10  F.3d 582, 586 (9th Cir. 1996). The court in *Butler* found the contractor defense to be "inapplicable

11  to a failure to warn claim in the absence of evidence that in making its decision whether to provide a

12  warning . . . [defendant] was acting in compliance with reasonably precise specifications imposed on

13  [it] by the United States." *Id.* at 586 (quotations omitted).

14       In the instant case, as discussed above, Defendants provide sufficient evidence, by way of the

15  Schroppe and Lehman declarations, that satisfies the first and second prongs of the *Boyle* test; the

16  United States Navy required, and approved, reasonably precise specifications and Foster Wheeler's

17  equipment conformed to these specifications. The outstanding question, therefore, is whether

18  Defendants submit sufficient evidence to establish the third prong; whether Foster Wheeler warned

19  the United States about the dangers in the use of the equipment that were known to Foster Wheeler

20  but not to the United States.

21       Defendants submit two declarations to support their contention that Foster Wheeler did not

22  have any knowledge about the dangers of the use of asbestos that were not known to the United

23  States Navy. First, Lehman testified that the U.S. Navy was well aware of the dangers of asbestos

24  and conducted extensive research concerning the hazard of exposure to asbestos, thus staying abreast

25  of the latest information, including the results of research. (Lehman Decl. ¶ 13.) The Navy made

26  deliberate decisions on the allocation of its resources in light of this knowledge. (*Id.*) Next,

27  Defendants submit the declaration of Lawrence Stilwell Betts, a retired Navy captain and medical

28  professional who is familiar with the industrial products used by the Navy, the Navy work

*United States District Court*
For the Northern District of California

9

United States District Court
For the Northern District of California

1   environments and the Navy occupational health program.  Betts testified that the Navy controlled

2   asbestos exposure consistent with the then current state of accepted scientific and medical

3   knowledge balanced by needs for national defense.  (Betts Decl. ¶ 31.)  Betts further testified that

4       [t]he Navy's knowledge regarding the applications of asbestos and the health effects
        represented the state of the art.  During the period from the early 1920s to the late
5       1960s, there was nothing about the hazards associated with the use of asbestos
        containing products used on or in boilers and auxiliary equipment on United States
6       Navy ships known by a boiler manufacturer, like Foster Wheeler, that was not known
        by the United States government and the United States Navy.
7
    (Betts Decl. ¶ 32.)[8]
8
        Plaintiff, in response, argues that, inter alia, Defendants have failed to establish that the Navy
9
    had knowledge about the dangers of using Foster Wheeler's asbestos-containing equipment or
10
    boilers specifically.  However, the testimony above regarding the Navy's superior knowledge is only
11
    part of the record before the Court.  Betts testifies that the Navy had the most current knowledge
12
    regarding the dangers of asbestos.  Schroppe and Lehman's testimony further establishes that the
13
    Navy knew of, and in fact required, the specific design parameters for the boilers made by Foster
14
    Wheeler.  Thus, if the boilers contained asbestos, then it was by design, known by the Navy, and was
15
    approved and/or required by the Navy.  The warnings regarding such asbestos were also according
16
    to, and limited by, the specifications set forth by the Navy.  Thus, Plaintiff's argument that the Navy
17
    did not have knowledge about the asbestos contained in Foster Wheeler's boilers is unavailing.
18
    Plaintiffs also present other related arguments challenging the Betts declaration.  Each argument,
19
    like their primary argument, discussed above, is similarly unavailing given the totality of the
20
    evidence in the record.
21
        The Court is mindful that Defendants need only present a colorable federal defense to
22
    Plaintiff's claims and need not prove that the defense will be meritorious.  *See Mesa*, 489 U.S. at
23
    128; *Ballenger*, 2007 WL 1813821 at *4.  Here, on this record, the Court finds that Defendants have
24
    established that they have a colorable federal defense.
25
    //
26
27
    ─────────────────
28  [8] The evidence specifically relied upon in this paragraph is admissible despite Plaintiffs' objections to the contrary.
    The objections to these sections of the Lehman and Betts declarations
    are the same boilerplate objections discussed above and the evidence is admissible for the same reasons already stated.

**United States District Court**
For the Northern District of California

1

## CONCLUSION

2   For the foregoing reasons, the Court **DENIES** the Motion to Remand.  Pursuant to the clear

3 language in *Durham*, the Court must interpret § 1442 broadly in favor of removal.  Given the

4 evidence in the record, Defendants have established the requisite basis for removal.

5

6 **IT IS SO ORDERED.**

7

8

9 Dated: February 21, 2008

                                               

10                    MARTIN J. JENKINS

                    UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28